UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case Number 19-81625-Civ-Middlebrooks/Reinhart

CHRISTOPHER VILLAR,

       **Plaintiff,**

vs.

CAMMARATA MANAGEMENT,
INC., a Delaware corporation, KM
ORGANIC FUND INC., a Florida
profit corporation, and MICHAEL
CAMMARATA,

       <u>Defendants.               </u>/

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

      Plaintiff, Christopher Villar, by and through his undersigned counsel, files this Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment pursuant Rule 56.1 of the Local Rules of the Southern District of Florida, and states:

### UNDISPUTED MATERIAL FACTS

1.    From November 2011, through October 2017, Plaintiff, CHRISTOPHER VILLAR ("Villar" or "Plaintiff") was employed by Defendants, CAMMERATA MANAGEMENT, INC. ("CMI") and MICHAEL CAMMARATA ("Cammarata").  *See* Declaration of Christopher Villar ("Villar Dec."), attached as **EXHIBIT 1**, ¶ 5.

2.    Cammarata and CMI established KM ORGANIC FUND INC. ("KMO") on or about December 5, 2014.  From that date until October 2017, when Villar's employment ceased, and at all times relevant to Villar's instant claim, Villar was employed by Cammarata, CMI and KMO (collectively "Defendants").  *Id.,* ¶ 6.

3.      KMO was the holding company for Cammarata's interest in Schmidt's Deodorant Company, LLC ("Schmidt's") – a company that manufactures and sells organic and natural products in interstate commerce throughout the United States. *Id.,* ¶ 6.

4.      Defendants describe CMI as "a management company founded by Cammarata that has engaged in business interests including the representation of musicians, actors and businesses in interstate commerce in the United States."

5.      Throughout Villar's employment, he was the executive assistant/secretary to Cammarata, responsible to perform all duties he assigned Villar on a day-to-day basis for CMI and, later, KMO as well.  Villar's duties included various clerical tasks, like accepting and making phone calls, setting business meeting agendas, sending memos/emails/letters, reviewing incoming communications, and setting Cammarata's daily schedule and travel itineraries, in accordance with his instructions. *Id.,* ¶ 9.

6.      Throughout each workday, I regularly and consistently engaged in interstate communications in order to perform the duties assigned to me by Cammarata.  These interstate communications included constant interstate emails and telephone calls, as well as ordering/receiving out-of-state packages and shipping orders of Defendants' products and samples all of the United States. *Id.,* ¶ 10.

7.      Cammarata hired Villar in November 2011.  *Id.,* ¶ 11.

8.      Initially, Villar was entirely unpaid, but after two (2) or three (3) months, Cammarata put Villar on the CMI payroll. *Id.,* ¶ 12.

9.      Thereafter, for the remainder of his employment, Defendants paid Villar a weekly salary that never exceeded $195 per week. *Id.,* ¶ 13.

10.      During the relevant period Villar's salary never exceeded $169 per week. *Id.*

11.     Cammarata determined both the method of Villar's pay (salary) and the amount Villar was paid each week.  *Id.,* ¶ 14.

12.     Once Villar began working for Defendants, Defendant Michael Cammarata dictated Villar's duties and how he was to perform them.  *Id.,* ¶ 15.

13.     Cammarata assigned Villar all his duties on a daily basis both verbally—in person or on the telephone—and in writing, through a constant stream of emails, texts, and telephone calls. *Id.,* ¶ 16; *see also* Exhibit A to Villar Dec. (Cammarata text message to Villar stating that "Kyle

<span style="color:red">Redacted</span>

<span style="color:red">Redacted</span>     ).  Furthermore, Cammarata determined and dictated Villar's hours, schedule and conditions of work, and specifically told Villar what duties to perform on a daily basis.  *See, e.g.,* KMO02840 (Cammarata text message to Villar stating that if a reservation "is f-

<span style="color:red">Redacted</span>     '); KMO001486

(Cammarata email to Villar stating                     <span style="color:red">Redacted</span>

<span style="color:red">Redacted</span>     .

14.     Cammarata is the owner of, and was responsible for running the daily operations of, CMI and KMO throughout Villar's employment with Defendants.  *Id.,* ¶ 17.

15.     As an employee, Defendants gave Villar a company email address (chris@cmistaff.com) and required Villar to send/receive all work-related emails from that address.  Likewise, throughout Villar's employment, he was required to use a signature block which identified CMI as his employer and CMI's main office address (5500 Military Trail 22-340 Jupiter, FL 33458) as my mailing address.  *Id.,* ¶ 18; *see also* **Exhibit B** to Villar Dec.

16.     Villar was in constant communication with Cammarata virtually every day for the entirety of his employment, so that he could assign Villar his duties and check on the progress of his assignments.  *Id.,* ¶ 19.

17.     Villar sent or received a total of approximately 59,000 emails (approximately 10,000 emails per year on average) from his company-assigned email address while employed by Defendants.  *Id.,* ¶ 20.

18.     Although Defendants have refused to produce copies of the emails in the course of discovery in this case, the vast majority of these communications were to or from Cammarata himself or were sent at his direction.  *Id.*

19.     In these e-mail communications, Cammarata would direct Villar to, among other things, schedule his appointments, book his travel, communicate with his customers, and handle various aspects of both of his personal and business affairs.  *Id.,* ¶ 21.

20.     For virtually the entirety of Villar's employment, Villar was Cammarata's "right hand" and was an integral cog in Defendants' ongoing business operations.  Most of Cammarata's work consisted of meetings, appointments, and travel that I scheduled.   Absent the work that I performed for Defendants, Cammarata would not have been able to function on a day-to-day basis and Defendants' business would have come to a halt. *Id.,* ¶ 22.

21.     Prior to working for Defendants, Villar had no experience as an executive assistant, and his job required no special skills.  To the contrary, the job simply required Villar to perform the clerical duties assigned by Cammarata in the manner in which Cammarata preferred, which was something Villar learned on the job.  *Id.,* ¶ 23.

22.     Due to the nature of Villar's work, the only tools required for the work were a laptop and a cell phone.  Although Villar purchased the laptop ($307.09), Defendants reimbursed for the

majority of the cost of the laptop ($250.00).  These payments are reflected on Villar's August 2013 Ally debit card statement.  *Id.,* ¶ 24; see also **Exhibit C** to Villar Dec.

23.     Defendants also paid the monthly charges associated with Villar's cell phone service and purchased a cellphone for him to use.  *Id.*

24.     Like Villar's weekly compensation, Cammarata determined if and in what amounts Defendants reimbursed Villar for expenses related to his job. *Id.,* ¶ 25.

25.     During his employment, Villar used the laptop and cellphone for all purposes, for both work and personal.  *Id.,* ¶ 26.

26.     Villar did not manage any aspect of his work, other than occasionally the order in which he performed some of his assigned tasks each day.  Rather, each day Cammarata assigned Villar tasks to complete and updated his tasks as the day progressed. *Id.,* ¶ 27.

27.     Throughout Villar's employment, he was required to begin work when he got up in the morning each day, and work until the end of the business day.  Villar worked this schedule most weekdays throughout my employment, and also worked on the weekends.  *Id.,* ¶ 28.

28.     Villar typically worked sixty (60) hours per week or more throughout his employment with Defendants, with the exception of his first few weeks of employment in 2011 and his final weeks of employment in October 2017. *Id.,* ¶ 29.

29.     Typically Villar worked 10 hours or more per day Monday through Friday and approximately 5-10 hours each weekend as well.  *Id.,* ¶ 30.

30.     Although Villar rarely missed a day of work, to the extent he had to miss a day of work for any reason, he was required to notify Defendants ahead of time.  Villar understood that if he failed to notify Defendants and missed a day of work, he could be terminated. *Id.,* ¶ 31.

5

31.     Due to the extensive hours Villar was required to work for Defendants, he was unable to have any other gainful employment during business hours while employed by Defendants.  The only other employment Villar had was for approximately four months at a restaurant owned by his family, where he worked 5-10 hours per week in the evenings, as a waiter serving dinner. *Id.,* ¶ 32.

32.     Villar was reliant on Defendants as my sole source of income for most of his nearly seven years of employment, but because Defendants paid him such a paltry sum, he had to supplement his income with credit cards, running up substantial credit card debt as a result.  *Id.,* ¶ 33.

33.     If there was any issue with a task that Cammarata had assigned to Villar, Villar was required to contact Cammarata to resolve any such issue.  *Id.,* ¶ 34.

34.     Defendants controlled all aspects of Villar's work.  *Id.,* ¶ 35.

35.     The only tools or materials Villar required to work were a laptop and cell phone, the laptop which Defendants reimbursed him for in large part and the cell phone which Defendants purchased for him. *Id.,* ¶ 36.

36.     Villar held no ownership in CMI and was not obligated for any of it losses or entitled to its profits, regardless of CMI's performance.  Rather, CMI paid for the expenses of its business and reaped any profits.  *Id.,* ¶ 37.

37.     Villar held no ownership in any of the Defendants, had no obligations for the losses of any of the Defendants, and the management of his tasks had no bearing on how much Villar earned from Defendants.  *Id.,* ¶ 39.

38.     Rather, Defendants provided the tools of his employment, paid the rent for their office spaces, and covered all other costs associated with their overhead.  *Id.*

39.     Whereas, Defendants incurred tens of thousands of dollars in business costs each month related to the ongoing operation of their businesses, Villar bore no obligation for these expenses. *Id., ¶* 40.

40.     Although Villar regularly worked over 40 hours per week, Defendants paid him sub-minimum wages throughout his employment and failed to pay overtime premiums as required by the FLSA. *Id., ¶* 41.

41.     Throughout his employment with Defendants, Defendants intentionally misclassified Villar as an independent contractor, in order to avoid paying the required payroll taxes, social security contributions, and workers compensation insurance premiums required by Federal and/or Florida laws. *Id., ¶* 42.

42.     In response to Villar's repeated complaints to Cammarata that Villar should be paid as an employee and not a contractor, Cammarata promised over and over that he would make Villar an employee, begin issuing me a W2 instead of a 1099, and give Villar a significant increase in his weekly pay. *Id., ¶* 43.

43.     Despite Cammarata's repeated representations that Defendants would eventually make Villar an employee and pay him appropriately, they never did.  Instead, Cammarata ultimately hired a new executive assistant to cover a portion of Villar's responsibilities, paying her through one of his other companies, and asked Villar to train her. *Id., ¶* 44.

Dated: April 6, 2020

Respectfully submitted,

**/s/ ANDREW R. FRISCH**
Andrew R. Frisch
FL Bar No.:  27777
MORGAN & MORGAN, P.A.

8581 Peters Road, Suite 4000
Plantation, Fl. 33324
Tel: 954-WORKERS
Fax: 954-327-3013
E-mail: afrisch@forthepeople.com

*Trial Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed using

the CM/ECF system, which I understand will send an electronic notice of same to all parties of

record, this 6th day of April, 2020.

**/s/ ANDREW R. FRISCH**
Andrew R. Frisch

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case Number 19-81625-Civ-Middlebrooks/Reinhart

CHRISTOPHER VILLAR,

      Plaintiff,

vs.

CAMMARATA MANAGEMENT,
INC., a Delaware corporation, KM
ORGANIC FUND INC., a Florida
profit corporation, and MICHAEL
CAMMARATA,

      Defendants.          /

## DECLARATION BY CHRISTOPHER VILLAR

I, CHRISTOPHER VILLAR, declare under penalty of perjury and pursuant to 28 U.S.C. §1746

as follows:

1.      My name is Christopher Villar.

2.      I am the Plaintiff in this action.

3.      I make this Declaration based upon personal knowledge.

4.      I am over the age of 18 years and competent to testify to the matters contained within this

Declaration.

5.      From November 2011, through October 2017, I was employed by Defendants,

CAMMERATA MANAGEMENT, INC. ("CMI") and MICHAEL CAMMARATA

("Cammarata").

6.      Cammarata established KM ORGANIC FUND INC. ("KMO") on or about December 5,

2014.  From that date until October 2017 when my employment ceased, and at all times relevant

to my instant claim, I was employed by Cammarata, CMI and KMO (collectively "Defendants").

7.      KMO was the holding company for Cammarata's interest in Schmidt's Deodorant Company, LLC ("Schmidt's") – a company that manufactures and sells organic and natural products in interstate commerce throughout the United States.

8.      Defendants describe CMI as "a management company founded by Cammarata that has engaged in business interests including the representation of musicians, actors and businesses in interstate commerce in the United States."

9.      Throughout my employment, I was the executive assistant/secretary to Cammarata, responsible to perform all duties he assigned me on a day-to-day basis for CMI and, later, KMO as well.  My duties included various clerical tasks, like accepting and making phone calls, setting business meeting agendas, sending memos/emails/letters, reviewing incoming communications, and setting Cammarata's daily schedule and travel itineraries, in accordance with his instructions.

10.     Throughout each workday, I regularly and consistently engaged in interstate communications in order to perform the duties assigned to me by Cammarata.  These interstate communications included constant interstate emails and telephone calls, as well as ordering/receiving out-of-state packages and shipping orders of Defendants' products and samples all of the United States.

11.     Cammarata hired me in November 2011.

12.     Initially, I was entirely unpaid, but after two (2) or three (3) months, Cammarata put me on the CMI payroll.

13.     Thereafter, for the remainder of my employment, Defendants paid me a weekly salary that never exceeded $195 per week.  Indeed, my salary during the relevant period never exceeded $169 per week.

2

14.     Cammarata determined both the method of my pay (salary) and the amount I was paid each week.

15.     Once I began working for Defendants, Defendant Michael Cammarata would tell me my duties and how to perform them.

16.     Cammarata assigned me all duties on a daily basis both verbally—in person or on the telephone—and in writing, through a constant stream of emails, texts, and telephone calls.  *See, e.g.,* KMO02840 attached as **Exhibit A** (Cammarata text message to Villar stating that "Kyle

Redacted

Redacted                         ).  Furthermore, Cammarata determined and dictated Villar's hours, schedule and conditions of work, and specifically told Villar what duties to perform on a daily basis.  *See, e.g.,* KMO02840 (Cammarata text message to Villar stating that if a reservation 'Reda

Redacted                                                      ');  KMO001486

(Cammarata email to Villar stating                    Redacted

Redacted                                     ).

17.     Cammarata is the owner of, and was responsible for running the daily operations of, CMI and KMO throughout my employment with Defendants.

18.     As an employee, Defendants gave me a company email address (chris@cmistaff.com) and required me to send/receive all work-related emails from that address.  Likewise, throughout my employment, I was required to use a signature block which identified CMI as my employer and CMI's main office address (5500 Military Trail 22-340 Jupiter, FL 33458) as my mailing address.  [*See, e.g.,* KMO001486-1495, 001542-47, 001581-83, 003170-3180 attached as **Exhibit B**.]

3

19.     I was in constant communication with Cammarata virtually every day for the entirety of my employment, so that he could assign me my duties and check on the progress of my assignments.

20.     I have been advised by Defendants that I sent or received a total of approximately 59,000 emails (approximately 10,000 emails per year on average) from my company-assigned email address while employed by Defendants.  Although Defendants have refused to produce copies of the emails in the course of discovery in this case, the vast majority of these communications were to or from Cammarata himself or were sent at his direction.

21.     In these e-mail communications, Cammarata would direct me to, among other things, schedule his appointments, book his travel, communicate with his customers, and handle various aspects of both of his personal and business affairs.

22.     For virtually the entirety of my employment, I was Cammarata's "right hand" and was an integral cog in Defendants' ongoing business operations.  Most of Cammarata's work consisted of meetings, appointments, and travel that I scheduled.  Absent the work that I performed for Defendants, Cammarata would not have been able to function on a day-to-day basis and Defendants' business would have come to a halt.

23.     Prior to working for Defendants, I had no experience as an executive assistant, and my job required no special skills.  To the contrary, my job simply required me to perform the clerical duties assigned by Cammarata in the manner in which Cammarata preferred, which was something I learned on the job.

24.     Due to the nature of my work, the only tools required for my work were a laptop and a cell phone.  Although I purchased the laptop ($307.09), Defendants reimbursed for the majority of the cost of the laptop ($250.00).  These payments are reflected on my August 2013 Ally debit

4

card statement.  [Villar00049 attached as **Exhibit C**.]   Defendants also paid the monthly charges associated with my cell phone service and purchased a cellphone for me to use.

25.     Like my weekly compensation, Cammarata determined if and in what amounts Defendants reimbursed me for expenses related to my job.

26.     During my employment, I used the laptop and cellphone for all purposes, for both work and personal.

27.     I did not manage any aspect of my work, other than occasionally the order in which I performed some of my assigned tasks each day.  Rather, each day Cammarata gave me tasks to complete and updated my tasks as the day progressed.

28.     Throughout my employment, I was required to begin work when I got up in the morning each day, and work until the end of the business day.  I worked this schedule most weekdays throughout my employment.  I would also work on the weekends.

29.     I typically worked sixty (60) hours per week or more throughout my employment, with the exception of my first few weeks of employment in 2011 and my final weeks of employment in October 2017.

30.     Typically I worked 10 hours or more per day Monday through Friday and approximately 5-10 hours each weekend as well.  [KMO attached as **Exhibit D**]

31.     Although I rarely missed a day of work, to the extent I had to miss a day of work for any reason, I was required to notify Defendants ahead of time.  I understood that if I failed to notify Defendants and missed a day of work, I could be terminated.

32.     Due to the extensive hours I was required to work for Defendants, I was unable to have any other gainful employment during business hours while employed by Defendants.  The only

other employment I had was for approximately four months at a restaurant owned by my family, where I worked 5-10 hours per week in the evenings, as a waiter serving dinner..

33.    I was reliant on Defendants as my sole source of income for most of my nearly seven years of employment, but because Defendants paid me such a paltry sum, I had to supplement my income with credit cards, running up substantial credit card debt as a result.

34.    If there was any issue with a task that Cammarata had assigned me, I was required to contact Cammarata to resolve any such issue.

35.    Defendants controlled all aspects of my work.

36.    The only things I was required to have were a laptop and cell phone, the laptop which Defendants reimbursed me for in large part and the cell phone which Defendants purchased for me.

37.    I held no ownership in CMI and was not obligated for any of it losses or entitled to its profits, regardless of CMI's performance.  Rather, CMI paid for the expenses of its business and reaped any profits.

38.    My only related investment was that a company I invested in, invested in a company owned by Defendant Cammarata, called Strategic Capital Partners Worldwide, LLC ("Strategic").  Defendants, however, have recently informed me that Strategic had no ownership in KMO or CMI (or Schmidt's for that matter).

39.    Consequently, I held no ownership in any of the Defendants, had no obligations for the losses of any of the Defendants, and the management of my tasks had no bearing on how much I earned from Defendants.  Rather, Defendants provided the tools of my employment, paid the rent for their office spaces, and covered all other costs associated with their overhead.

40.     Whereas, Defendants incurred tens of thousands of dollars in business costs each month related to the ongoing operation of their businesses, I bore no obligation for these expenses.

41.     Although I regularly worked over 40 hours per week, Defendants paid me sub-minimum wages throughout my employment and failed to pay overtime premiums as required by the FLSA.

42.     Throughout my employment with Defendants, Defendants intentionally misclassified me as an independent contractor, in order to avoid paying the required payroll taxes, social security contributions, and workers compensation insurance premiums required by Federal and/or Florida laws.

43.     In response to my repeated complaints to Cammarata that I should be paid as an employee and not a contractor, he promised over and over that he would make me an employee, begin issuing me a W2 instead of a 1099, and give me a significant increase in my weekly pay.

44.     Despite Cammarata's repeated representations that Defendants would eventually make me an employee and pay me appropriately, they never did.  Instead, Cammarata ultimately hired a new executive assistant to cover a portion of my responsibilities, paying her through one of his other companies, and asked me to train her.

45.     If called to testify at trial in this action, I will testify in accordance with this declaration.

Executed this 6th day of March, 2020, in Maury County, Tennessee.

I, __Chris Villar_____ declare under penalty of perjury that the foregoing is true and correct:


_____
SIGNATURE

# **<u>EXHIBIT A</u>**

**CONFIDENTIAL**

**TO BE FILED UNDER SEAL**

# **<u>EXHIBIT B</u>**

**CONFIDENTIAL**

**TO BE FILED UNDER SEAL**

# **EXHIBIT C**

# ally®

**COMBINED CUSTOMER STATEMENT**

**Statement Date**
08/05/2013
Page 3

**Customer Care Information**
Toll Free 877-247-ALLY (2559)
www.ally.com

## Activity

| Date | Description | Credits | Debits | Balance |
|------|-------------|---------|--------|---------|
| 07/08/2013 | Check Card Purchase<br>TAQUERIA 2 POTRILLOS TAQUERIA 2<br>POTRILLOS PERRIS, CA, US | $0.00 | -$4.97 | $40.52 |
| 07/08/2013 | Check Card Purchase<br>CHEVRON 0209519   Q61 CHEVRON<br>0209519   Q61 MURRIETA, CA,<br>US | $0.00 | -$2.85 | $37.67 |
| 07/08/2013 | Check Card Purchase<br>DEL TACO 0075 DEL TACO 0075<br>REDLANDS, CA, US | $0.00 | -$2.37 | $35.30 |
| 07/10/2013 | Direct Deposit<br>JPMorgan Chase QuickPay | $250.00 | -$0.00 | $285.30 |
| 07/10/2013 | ATM Withdrawal<br>*STATER BROS *STATER BROS<br>REDLANDS, CA, US | $0.00 | -$102.00 | $183.30 |
| 07/11/2013 | Direct Deposit<br>JPMorgan Chase QuickPay | $189.00 | -$0.00 | $372.30 |
| 07/11/2013 | Check Card Purchase<br>SOU BEST BUY #150  2617 SOU BEST<br>BUY #150  2617 SAN<br>BERNARDIN, CA, US | $0.00 | -$307.09 | $65.21 |
| 07/11/2013 | Check Card Purchase<br>ECONO LUBE AND ECONO LUBE AND<br>ONTARIO, CA, US | $0.00 | -$39.98 | $25.23 |
| 07/11/2013 | Check Card Purchase<br>VALERO 3785 VALERO 3785 REDLANDS,<br>CA, US | $0.00 | -$22.15 | $3.08 |
| 07/12/2013 | Check Card Purchase<br>CORNER STORE 3785 CORNER STORE<br>3785 REDLANDS, CA, US | $0.00 | -$15.00 | -$11.92 |
| 07/18/2013 | Direct Deposit<br>JPMorgan Chase QuickPay | $157.00 | -$0.00 | $145.08 |
| 07/18/2013 | Check Card Purchase<br>STATERBROS112 STATERBROS112<br>REDLANDS, CA, US | $0.00 | -$105.70 | $39.38 |
| 07/18/2013 | Check Card Purchase<br>EXXONMOBIL EXXONMOBIL REDLANDS,<br>CA, US | $0.00 | -$16.38 | $23.00 |
| 07/18/2013 | Check Card Purchase<br>STATERBROS112 STATERBROS112<br>REDLANDS, CA, US | $0.00 | -$12.61 | $10.39 |

VILLAR-00049

# **<u>EXHIBIT D</u>**

| | |
|---|---|
| **From:** | Christopher Villar [chris@cmistaff.com] |
| **Sent:** | 8/5/2017 3:07:32 PM |
| **To:** | Janelle Morea [janelle@schmidtsnaturals.com] |
| **CC:** | Michael Cammarata Assistant [mc_asst@cmistaff.com]; Michael Cammarata [mc@cmistaff.com] |
| **Subject:** | Re: Hey |

I apologize Janelle, I forgot to answer your first question! Yes, I am still dealing with Schmidt's workflow.

To keep you abreast on this I am spending 1 hr in the morning and 1 hr in the evening doing conflict checks (and spot checking throughout the day) on calendars related to Schmidt's and Mikes other calendars. I spend about 3 hours or more a day reviewing inflow of emails related to Schmidt's and Schmidt's staff. I am spending a total of at least 30 hrs (including weekends) a week on Schmidt's still.

I was spending 40+ hrs a week + weekends before you took over scheduling/travel ect on Schmidt's ever since Mike got involved back in 2014. Lots of calls, lots of emails!!!

Anyway, apologies again for being short in my first response.

Hope you are well and holding up! And again have a great weekend!

Best,

Chris
--
Christopher Villar | RO

Office: (866) 606-4184
Direct: (561) 935-3100
Fax: (310) 362-8452
Email: chris@cmistaff.com

Website: www.randomoccurrence.com

Cammarata Management, Inc. (Notices & Mail Only)
d/b/a Random Occurrence
5500 Military Trail 22-340
Jupiter, Florida 33458

CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by U.S. Treasury Regulations, Cammarata Management, Inc. informs you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE:
The information transmitted in this email is intended only for the person(s) or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please contact the sender and permanently delete the email from any computer.

KMO002191

On Aug 5, 2017 12:18 PM, "Christopher Villar" <chris@cmistaff.com> wrote:
You too!!

--
Christopher Villar | RO

Office: (866) 606-4184
Direct: (561) 935-3100
Fax: (310) 362-8452
Email: chris@cmistaff.com

Website: www.randomoccurrence.com

Cammarata Management, Inc. (Notices & Mail Only)
d/b/a Random Occurrence
5500 Military Trail 22-340
Jupiter, Florida 33458

CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by U.S. Treasury Regulations, Cammarata Management, Inc. informs you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE:
The information transmitted in this email is intended only for the person(s) or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please contact the sender and permanently delete the email from any computer.


On Aug 5, 2017 12:16 PM, "Janelle Morea" <janelle@schmidtsnaturals.com> wrote:
Thanks Chris!

Have a great weekend! :)

On Sat, Aug 5, 2017 at 8:35 AM, Christopher Villar <chris@cmistaff.com> wrote:
Hi Janelle,

Nothing to report at the moment, if something does come up Ill be sure to forward the information to you promptly.

Kind Regards,

Chris

--
Christopher Villar | RO

Office: (866) 606-4184

KMO002192

Direct: (561) 935-3100
Fax: (310) 362-8452
Email: chris@cmistaff.com

Website: www.randomoccurrence.com

Cammarata Management, Inc. (Notices & Mail Only)
d/b/a Random Occurrence
5500 Military Trail 22-340
Jupiter, Florida 33458

CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by U.S. Treasury Regulations, Cammarata Management, Inc. informs you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE:
The information transmitted in this email is intended only for the person(s) or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please contact the sender and permanently delete the email from any computer.

On Aug 3, 2017 9:17 PM, "Janelle Morea" <janelle@schmidtsnaturals.com> wrote:
Hi Chris, How are you?

Are you still handling anything Schmidts related? If so, can you please send me a list? Please let me know at your earliest convenience.

Much thanks!

Best,
Janelle

Sent from my iPhone


--
Janelle Morea
Executive Assistant to Michael Cammarata
schmidtsnaturals.com
+1 (561) 935-3100


The information transmitted in this email is intended only for the person(s) or entity to which it is addressed and

KMO002193

may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this email in error, please contact the sender and permanently delete the email from any computer.

KMO002194