# Exhibit A

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA

2 _____

3 CHRISTOPHER VILLAR,

4               Plaintiff,

5     vs.              Case No. 19-81625-CIV
                         MIDDLEBROOKS/BRANNON

6

    CAMMARATA MANAGEMENT, INC.,

7    a Delaware Corporation, KM
    ORGANIC FUND INC., a Florida

8    Profit Corporation, and MICHAEL
    CAMMARATA,

9

             Defendant.

10 _____

11       THE DEPOSITION OF CHRISTOPHER VILLAR
              MARCH 31, 2020

12

13

14

15

16

17

18

19

20

21       ALPHA REPORTING CORPORATION
      PATRICIA A. NILSEN, RMR, CRR, CRC

22          One Vantage Way
        Nashville, TN 38228

23         615.244.4812
       www.alphareporting.com

24

25

                           Page 1

1              The deposition of CHRISTOPHER

2        VILLAR, taken on behalf of the Defendants, pursuant

3        to Notice on MARCH 31, 2020, beginning at

4        approximately 12:21 p.m. in the offices of Alpha

5        Reporting.

6              This deposition is taken in

7        accordance with the terms and provisions of the

8        Federal Rules of Civil Procedure.  All objections

9        are reserved except as to form.

10             The signature of the witness is

11       reserved.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  2

```
 1                        APPEARANCES
 2
        For the Plaintiff:
 3
                         ANDREW R. FRISCH
 4                       Attorney at Law
                         MORGAN & MORGAN
 5                       8151 Peters Road, 4th Floor
                         Plantation, FL 33324
 6                       945.WORKERS
                         Afrisch@forthepeople.com
 7
        For the Defendant:
 8
                         JEFF JOYNER
 9                       RADHA D.S. KULKARNI
                         Attorneys at Law
10                       GREENBERG TRAURIG
                         1840 Century Park East, Suite 1900
11                       Los Angeles, CA 90067
                         310.586.3877
12                       joynerj@gtlaw.com
13                       BRIDGET A. BERRY
                         Attorney at Law
14                       777 South Flagler Drive
                         Suite 300 East
15                       West Palm Beach, FL 33401
                         561.650.7912
16                       berryb@gtlaw.com
17                       COLIN W. FRASER
                         Attorney at Law
18                       18565 Jamboree Road, Suite 500
                         Irvine, CA 92612
19                       949.732.6663
                         frasercw@gtlaw.com
20
        Stenographically Reported By:
21
                         PATRICIA A. NILSEN, RMR, CRR, CRC
22                       TN Certified Court Reporter
                         Alpha Reporting Corporation
23                       One Vantage Way
                         Nashville, Tennessee 38228
24                       615.244.4812
25
        Videotaped By: DAVID DRUMEL
```

Page 3

```
 1                        INDEX
 2
      WITNESS:                                    PAGE
 3
 4             CHRISTOPHER VILLAR
 5   Examination
      By Mr. Joyner                                 7
 6
     Examination
 7    By  Mr. Frisch                               255
 8                       EXHIBITS
 9   NUMBER            DESCRIPTION               PAGE
10   EXHIBIT 1   Notice of deposition             10
11   EXHIBIT 2   Order memorializing discovery    22
12               rulings
13   EXHIBIT 3   Second notice of deposition      23
14   EXHIBIT 4   Complaint and demand for jury    35
15               trial
16   EXHIBIT 5   Résumé of Chris Villar           65
17   EXHIBIT 6   E-mail from Christopher         161
18               Villar dated January 14, 2015
19   EXHIBIT 7   Notice of filing plaintiff's    175
20               statement of claim
21   EXHIBIT 8   1099s from 2013                 183
22   EXHIBIT 10  Text messages                   190
23   EXHIBIT 12  E-mail from Christopher         221
24               Villar dated 7/28/2017
25   EXHIBIT 13  E-mail from Jeff Doiron dated   223
```

Page 4

```
 1                    12/25/2016
 2   EXHIBIT 14   E-mail from Christopher      224
 3                Villar dated 12/25/2016
 4   EXHIBIT 18   E-mail from Drew Cohen dated  214
 5                1/24/2017
 6   EXHIBIT 19   E-mail from Christopher      217
 7                Villar dated 6/16/2017
 8   EXHIBIT 20   E-mail from Christopher      217
 9                Villar dated 6/5/2017
10   EXHIBIT 21   E-mail from Christopher      217
11                Villar dated 6/5/2017
12   EXHIBIT 23   E-mail from Janelle Morea    207
13                dated 8/5/2017
14   EXHIBIT 24   E-mail from Janelle Morea    209
15                dated 7/17/2017
16   EXHIBIT 26   Defendant's first request for  239
17                production to plaintiff
18   EXHIBIT 27   Christopher Villar's         243
19                responses and objections to EG
20                Systems, LLC's first request for
21                production
22   EXHIBIT 28   Document with cover sheet     243
23                     Exhibit A, containing text messages
24
25
                                              Page 5
```

```
 1                    VIDEOGRAPHER:  We are going on the
 2         record at 12:21 p.m. on March 31, 2020.  This is
 3         media unit one in the video-recorded deposition of
 4         Christopher Villar, in the matter of Villar vs.
 5         Cammarata Management Inc., called in the United
 6         States District Court for the Southern District of
 7         Florida, West Palm Beach Division, Case
 8         Number 19-81625-CIV-Middlebrooks/Brannon.
 9                    This deposition is being held at
10         Alpha Nashville, located at One Vantage Way in
11         Nashville, Tennessee.  My name is David Drumel; I'm
12         the videographer.  The court reporter is Patricia
13         Nilsen.
14                    Counsel attending remotely, please
15         identify yourselves for the record at this time.
16                    MR. FRISCH:  This is Andrew Frisch,
17         Morgan & Morgan, for the plaintiff, Chris Villar.
18                    MR. JOYNER:  Hello.  This is Jeff
19         Joyner of Greenberg Traurig, and we also have
20         Bridget Berry, Radha Kulkarni, and Colin Fraser of
21         Greenberg Traurig on behalf of defendants.
22                    VIDEOGRAPHER:  Will the court
23         reporter please swear in the witness.
24                    CHRISTOPHER VILLAR,
25         having been first duly sworn, was examined
```

Page 6

```
1        Q.      During what year did you get your GED in

2    Mesa, Arizona?

3        A.      Probably 2004 or something like that.

4        Q.      Other than the Los Angeles Film School,

5    did you attend any other schools after you received

6    your GED?

7        A.      No, I did not.

8        Q.      When did you attend the Los Angeles Film

9    School?

10       A.      I attended the Los Angeles Film School two

11   thousand and -- two thousand and -- if I recall

12   correctly, 2006 and 2007.

13       Q.      Why did you want to attend the Los Angeles

14   Film School?

15       A.      Because I -- at the time, I was an actor,

16   and I wanted to learn behind the scenes how to

17   screenwrite and produce.  Although I ended up

18   not -- I ended up dropping screenwriting, and I

19   gravitated towards producing.

20       Q.      Why did you decide to move toward

21   producing?

22       A.      I just liked it better.  I liked coming up

23   with stories for a film and not specifically

24   writing them.  The concept, stuff like that.

25       Q.      Were you still acting when you decided to
```

Page 57

```
 1        go off the record.

 2                    VIDEOGRAPHER:  Off the record

 3        at 2:37.

 4                    (Recess)

 5                    VIDEOGRAPHER:  Returning to the

 6        record.  The time is 2:47 p.m.

 7        BY MR. JOYNER:

 8        Q.      Mr. Villar, before you had to use the

 9        restroom again, we were talking about overtime, and

10        I just want to clarify that you were aware, at the

11        time you were working for each of your employers,

12        that you were entitled to overtime if you worked

13        40 hours in a week, correct?

14        A.      I -- in regards to when I was a teenager,

15        I can't tell you that I knew the ins and outs of

16        the labor laws.  I don't remember that far back.

17        Q.      So the two jobs you told me that you

18        remember receiving overtime payments were In The

19        Nick Of Time and as an extra, correct?

20        A.      Yes.

21        Q.      When you worked -- go ahead.

22        A.      However, from what I remember, the rules

23        of overtime for extra work are -- are different

24        from a normal job, right?

25        Q.      So when you were working for In The Nick
```

                                                Page 75

```
 1          that time that you were entitled to overtime from
 2          the plastering company if you worked over 40 hours
 3          in a week?
 4          A.      I don't remember what I knew back then
 5          about labor laws.  And that -- that's being honest,
 6          so -- I honestly don't recall if I knew or didn't
 7          know.
 8          Q.      When were you working for the spreader on
 9          the cow farm?
10          A.      That was probably -- probably in 2007
11          or '8.  It was after I went to film school.
12          Q.      Did you work overtime for the cow
13          spreader?
14          A.      It's possible.
15          Q.      Did you know at the time that you worked
16          as a spreader on a cow farm that you were entitled
17          to overtime if you worked more than 40 hours in a
18          week?
19          A.      It's possible that I knew.  But again, I
20          don't remember what I knew or what I didn't know
21          back then.
22          Q.      When did you first learn that you were
23          entitled to overtime if you worked more than
24          40 hours in a week?
25          A.      I don't remember when I first learned it.
```

Page 81

1     I could have known back then; I -- that's what I'm
2     saying.  I don't -- I don't remember.
3           I'm trying to think what I -- I
4     definitely -- I definitely started to -- I
5     definitely started to learn about overtime when I
6     was doing background work.  That was two thousand
7     and -- during the time period that I -- around
8     2008, 2009, possibly -- potentially.  2009.
9     Q.      When you say "background work," what were
10    you doing in 2008 and 2009 that would be background
11    work?
12    A.      Well, in regards to specific dates, just
13    so we're clear, I -- I'm trying to give you the
14    most exact information that I can remember, because
15    this was a long time ago.  So I -- but I did do a
16    lot of extra work on film sets.  And that was after
17    I went to film school, so -- and it was before
18    2010.  And so that would -- that could only be a
19    time that I could honestly tell you that I became
20    very aware of what overtime was.
21    Q.      And what was your next job after your
22    extra/background work?
23    A.      So I believe that the last thing I did
24    before working for Michael was background work.
25    But, you know, I was also -- and before I started

Page 82

```
 1          involved in the film projects, movies, and
 2          entrepreneurial work that you referred to earlier?
 3          A.        Well, Katy Perry.
 4                    (Reporter clarification)
 5          Q.        You know, a lot of the group -- you know,
 6          there was just one film project that I had talked
 7          to her about.  And she's -- I've known her since I
 8          was -- since I was eleven years old, so -- her
 9          family is really close with mine, you know, my
10          grandparents and her parents.
11                    But that specific project was called
12          Suburban Jungle, and the writer was Corey Miller,
13          and he -- his wife used to baby-sit me as a kid.
14          And me and some of my -- some of my friends from
15          film school were, you know, attached to -- helped
16          me direct and produce and stuff like that.
17                    (Reporter clarification)
18          A.        I was -- I was just saying -- I don't
19          remember if -- I don't remember most of the kids
20          from film school who were -- who were going to help
21          me with that project, so kind of most of what I
22          remember, the project didn't go anywhere.  It was
23          actually something that Mike and I had talked about
24          eventually, further down the road.  But my option
25          had ran out, so nothing ever happened with it.
```

Page 88

1          The other -- the other situation that I

2     was in, I'm not allowed to talk about, because

3     there were legal proceedings and lawsuits that have

4     taken place, none of which I was plaintiff or

5     defendant, but I'm not supposed to talk about what

6     happened during -- basically a bad man stole a lot

7     of money from a lot of people, and there's not much

8     I can -- I'm not supposed to talk about it.

9     Q.      So before we talk about these film

10    projects, are there any others, any other film

11    projects you worked on?

12    A.      Before Cammarata Management?

13    Q.      At any time.

14    A.      At any time?  Well, I worked -- at

15    Cammarata Management, I worked on a lot of film

16    projects.

17    Q.      Okay.

18    A.      Other -- for the Suburban Jungle -- for

19    the Suburban Jungle, Mike said that -- and this was

20    before I started working for him, though, but he

21    said that he was going to talk to Floyd Mayweather

22    about funding that.  I said all right, but...

23    Q.      So just for the record, so it's clear,

24    remember, we're putting together questions and

25    answers so that there's a clear factual record.

```
 1              When you mention "Mike," are you referring

 2      to Michael Cammarata?

 3      A.      Yes.

 4      Q.      So -- so other than the Suburban Jungle --

 5      let's just call it "the lawsuit project" -- and

 6      what you referred to as Cammarata Management film

 7      projects, are there any other film projects that

 8      you worked on?

 9      A.      As like a producer, trying to put stuff

10      together?

11      Q.      Yes.

12      A.      Outside of -- oh, yeah.  I had been

13      working on a project called -- well, it went

14      through various different names, but eventually it

15      was turned into a book series.  It's called the

16      Indigo Project.

17      Q.      Any others?

18      A.      I worked on -- I mean, now, as a producer

19      or as just somebody working on a film project?

20      Because I -- when I worked for Mike, we worked on a

21      lot of different film-related projects; but in

22      terms of me being a producer, you know, it was the

23      Suburban Jungle, and then it was the Indigo

24      Project.

25      Q.      Right.  So right now we're referring to
```

Page 90

```
 1      A.      Well, I was kind of going through a
 2   midlife crisis when I was 18 years old, and I got
 3   back into acting, and I did not want to just be an
 4   actor; I wanted to learn behind the scenes also.
 5   That's why I went to film school, to learn how
 6   films were made.
 7      Q.      And did that experience in film school
 8   help you with your producing and putting projects
 9   together?
10      A.      Yes.
11      Q.      With respect to Suburban Jungle, the
12   lawsuit project, or the Indigo Project, did you
13   profit financially from any of those three
14   projects?
15      A.      I did not.  Well, okay.  I did receive --
16   I wouldn't -- I wouldn't call it a profit, though,
17   because technically, on the Indigo Project, I'm
18   still in the red and have not made back my
19   investment on that.  But I did receive a check for
20   some of -- it was a small check; it wasn't even
21   100 bucks -- for book sales.
22      Q.      So when would you consider yourself to
23   have made a profit on the Indigo Project?
24      A.      I have not made a profit on that.
25      Q.      Why have you not made a profit?
```

Page 92

```
 1      A.       Well, for one, I don't know what to do
 2   with the project just yet because of all this mess
 3   that I have with Mike right now.  And for two, I
 4   haven't had time to work on it.  I've been trying
 5   to keep a roof over my head and juggle that, and
 6   fighting for -- fighting for my life that people
 7   are trying to just take away from me, so ...
 8      Q.       So but for the Indigo Project -- how were
 9   you compensated for the Indigo Project?
10      A.       Never compensated.
11      Q.       When you receive --
12      A.       If you're talking about the check that was
13   sent to me, it was -- it was issued by KM Organic
14   Fund, which I don't know why because --
15      Q.       And where did --
16      A.       -- the book distribution was --
17               (Reporter interruption)
18      A.       Yes.  I said that the check was issued to
19   me from KM Organic Fund, but I don't know why,
20   because book distribution deal was set up with
21   Independent Publishers Group, INscribe Digital
22   through Cammarata Management Inc.  So I don't know
23   why they sent me a check when the money was
24   supposed to go to Cammarata Management Inc.
25               And I just trusted that Mike was going to
```

Page 93

1      pay me, you know, whatever he made from the book

2      sales.  I don't even know if we have made anything

3      since then so...

4      Q.      Under what structure, though, did you

5      receive money from the Independent Publishers

6      Group?  Were you to receive a percentage of sales

7      of the book?

8      A.      Yeah.  So Cammarata Management Inc. was to

9      receive, you know, X amount of -- you know, a

10     percentage of the sales of the books, yes.

11     Q.      And the reason you say you're still in the

12     red is because you had put more expenses into the

13     Indigo Project than you have received back in the

14     way of your percentage; is that correct?

15     A.      That is correct.

16     Q.      Do you remember what your expenses were on

17     the Indigo Project?

18     A.      Not specifically, but I paid for artwork

19     and the advertisement.

20     Q.      So would your expenses have been more than

21     $10,000 on the Indigo Project?

22     A.      No.

23     Q.      Would they have been more than 5 -- sorry,

24     we had -- we had an interruption.

25             Would there have been more than $5,000 in

Page 94

```
1        expenses on the Indigo Project?

2     A.      No.

3     Q.      Would there have been more than $2,000 on

4     the Indigo Project?

5     A.      I believe that there -- there could have

6     been over $2,000 spent, but I wasn't the only one

7     that spent money on that.  I put money into it.

8     Kyle Smithson put money into it.

9     Q.      Who else put money into the Indigo

10    Project?

11    A.      Well, I don't know if you call this

12    putting money into it, but Mike ran a -- he ran

13    a -- he ran an ad -- he ran some publicity on

14    himself in regards to his new -- his new

15    arrangement with Independent Publishers Group.  And

16    it talked about the release of the book, but it

17    also talked about Schmidt's Naturals and his

18    position there.  So it was a mixture of things.  So

19    it wasn't specifically money put into books.

20    Q.      When you say Michael Cammarata had some

21    publicity about the book, what -- what are you

22    referring to?

23    A.      There was an article that he requested to

24    be put out.  You can Google it, if you want.

25    Q.      During what year was that article?
```

```
 1        A.        I don't remember exactly.

 2        Q.        Would it have been before 2011 or after

 3   2011?

 4        A.        Oh, this was in like two thousand -- it

 5   was way after 2011.

 6        Q.        Would it have been after 2012?

 7        A.        Yes.

 8        Q.        After 2013?

 9        A.        Yes.

10        Q.        After 2014?

11        A.        Yes.

12        Q.        After 2015?

13        A.        Yes.  It was sometime around 2015 or 2016,

14   I believe.

15        Q.        So when -- when do you think the Indigo

16   Project would start making a profit?  At what -- at

17   what dollar amount would you be out of what you

18   call the red?

19        A.        I have no idea.

20        Q.        Were you tracking the sales of the book?

21        A.        For a while, I was, but I don't know

22   what's going on with them now, because I don't work

23   for Mike anymore, so he has control over all that.

24        Q.        So the check that was issued to you for

25   your percentage that had come from Independent
```

Page 96

1    Publishers Group, was that separate and apart from

2    anything you were being paid by Cammarata

3    Management or KM Organic for your work?

4    A.      Yes.  That was separate.

5    Q.      So your work as an individual producer was

6    independent of your work for Cammarata Management

7    and KM Organic; is that correct?

8    A.      Anything that I did as a producer after I

9    started working for Cammarata was with Cammarata

10   and for his companies.

11   Q.      So why were you being paid a percentage of

12   the moneys that were received from Independent

13   Publishers Group if it was --

14   A.      Because I -- because I owned -- co-owned

15   and co-created that book series.

16   Q.      Okay.  So was the Indigo Project something

17   separate and apart from your work with Cammarata

18   Management and KM Organic?

19   A.      It was -- it was a part of my work for

20   Cammarata Management.

21   Q.      What do you mean by a part of your work

22   for Cammarata Management?  Can you explain that?

23   A.      Well, because it was a project that the

24   company was doing in addition to all the other

25   projects that the company was doing.  I just

Page 97

1  happened to -- I just happened to -- it just

2  happened to be something that I was a part of.

3  Q.      But you just said that you owned the

4  project, correct?

5  A.      I don't solely own the project.  In fact,

6  there's no official paperwork on the project; it's

7  kind of a mess.  But --

8  Q.      How does that --

9  A.      -- it was something that -- it was

10 something that -- in fact, it's something that me

11 and Mike had been working on way before I even

12 started -- way before I became his employee, so ...

13 Q.      So how did the Indigo Project originate?

14 A.      It originated as an idea, which was then

15 converted into a screenplay for a movie, and then

16 adopted into a book series.

17 Q.      Who developed the idea for the Indigo

18 Project?

19 A.      Myself; a writer named Christopher

20 Desousa; and Mike had some ideas, although I

21 strongly believe that his accreditation on that

22 project was a pure vanity credit, so ...

23 Q.      What was your role in making that project

24 come to fruition?

25 A.      I wrote the treatment.  And I wrote that

                                        Page 98

```
 1          before I started working for Mike.  And when --
 2     Q.       Did anybody pay you --
 3     A.       No.
 4     Q.       -- the treatment?
 5     A.       No.  No, no, no.  Wrote the treatment, got
 6          a writer, worked with the writer, developed the
 7          story.
 8     Q.       And when did you first mention the project
 9          to Michael Cammarata?
10     A.       We -- I believe that at the time I was,
11          you know, trying to help -- or I had Suburban
12          Jungle, and then there were some other things that
13          I was trying to raise money for.  And he told me
14          that, you know, I needed to -- I just needed to
15          come up with a new idea of my own.  So I think we
16          started doing that in 2010.
17     Q.       Okay.  So you had already met Mike when
18          you came up with the idea for the Indigo Project?
19     A.       Yeah, I came up with it after I met Mike.
20     Q.       So let's just clarify this.  When did you
21          meet Michael Cammarata?
22     A.       I met him in -- oh, boy.  I believe it was
23          early 2010.
24     Q.       Who introduced you to Michael Cammarata?
25     A.       I was introduced through a -- at the time,
```

Page 99

```
 1        it was a mutual friend, and then we hung out and
 2        became friends.
 3        Q.      What was the name of that mutual friend
 4        that introduced you to Michael Cammarata?
 5        A.      His name was Trevor Klein.
 6        Q.      What did Trevor Klein do?
 7        A.      I have no idea.
 8        Q.      How did you know Trevor Klein?
 9        A.      He was just a kid that lived down in the
10        Oakwood Apartments, where I lived.  Or have lived,
11        because I lived there when I went to film school.
12        At the time we were all young, so -- it was a long
13        time ago.  I don't really remember specifics.
14        Q.      What were your dealings with Trevor Klein?
15        A.      I had no dealings with Trevor Klein.  He
16        just was a kid that lived in the apartment complex,
17        part of a group of friends, and we all used to go
18        out and hang out.
19        Q.      So you never had any business transactions
20        or deals with Trevor Klein?
21        A.      No, I did not.  But at the time, I think
22        that he was doing something with Mike for talent
23        management, or one -- to that extent.  And so when
24        we went out to the -- I forget the name of the
25        hotel that we were at -- I believe he was trying to
```

Page 100

1      projects together or putting stuff together as a

2      producer, do you view that as one of your strong --

3      stronger skills?

4      A.     I don't know if it's so much my genius or

5      more so my willingness to not give up, and pursue

6      things to the end.  But -- but yes, I do enjoy -- I

7      do enjoy putting things together.

8      Q.     Would you say perseverance, as -- as you

9      described, is one of the key attributes to a good

10     producer in the film industry?

11     A.     I -- I've been so far removed from the

12     film industry, I -- I don't -- I don't know what

13     makes a good producer and what doesn't.  I didn't

14     have a successful career as one.  But I would think

15     that that's a good quality to have for almost

16     anything you do in life.

17     Q.     Do you know how much the book sold for, in

18     the Indigo Project?

19     A.     Well, the book was never sold.  It just

20     had some -- some book sales.

21     Q.     Was it not offered for sale in paperback

22     and hard book on Amazon?

23     A.     Oh, yeah, well, it was.  Yes, it was

24     offered for sale in paperback and hardback.  I

25     don't remember exactly how much it was listed for

1       sale by the different websites.

2       Q.      When you provided documents to your

3       counsel that were to be produced to us, did you

4       provide any documents related to the Indigo

5       Project?

6       A.      I believe that all documents responsive to

7       whatever you asked for were -- were sent to you.  I

8       don't know what about the Indigo Project you're

9       specifically talking about.

10      Q.      Okay.  All of those documents that you

11      sent to be produced to us, did any of those

12      documents include anything about the Indigo

13      Project?

14      A.      I don't recall.  What -- what specifically

15      would you like to see, or are after?

16      Q.      Well, it was requested in our document

17      request that, for example, the things you just

18      mentioned to me about expenses, the treatment, the

19      price of the paperback and the hardcover that was

20      sold on Amazon, the percentage you were entitled

21      to, the check you received from KM that had come

22      from IPG, all of these things that you mentioned

23      today in your answers, did you provide any

24      documents with any of that information to your

25      counsel?

```
1    A.        I think that back then, I possibly had a
2    company.
3    Q.        What was the name of that --
4    A.        I had a -- I had a company called Verbum
5    Films, but I can't remember if they were on the
6    option agreement or if it was me that was on the
7    option agreement.   I -- I don't remember, because
8    that was so long ago.
9    Q.        Was that Verbo Films, V-E-R-B-O?
10   A.        Verbum, V-E-R-B-U-M.   Verbum Films.
11   Q.        Other than the option agreement and work
12   on the Suburban Jungle project, did Verbum Films
13   work on any other film projects?
14   A.        Not that were exclusively mine.
15   Q.        What about projects that were not
16   exclusively yours?  Did Verbum Films work on any
17   projects that were not exclusive to you?
18   A.        No.
19   Q.        Okay.
20             MR. JOYNER:  I see that Andrew has
21   dropped -- just dropped off the participant list,
22   but I don't know if he's having technical
23   difficulties again.  So I think -- do we have
24   anybody on the line from Morgan & Morgan, Chris
25   Villar's law firm?
```

Page 114

```
 1                      All right, so I think unfortunately
 2       we have to go off the record again while Andrew
 3       figures out how to dial back in.
 4                      VIDEOGRAPHER:  Off the record
 5       at 4:02.
 6                      (Recess)
 7                      VIDEOGRAPHER:  Returning to the
 8       record.  The time is 4:18.
 9       BY MR. JOYNER:
10       Q.      Who is Gerald Molen, Mr. Villar?
11       A.      Gerald Molen is an Academy Award-winning
12       producer.
13       Q.      How do you know him?
14       A.      I've never personally met him.
15       Q.      How do you know of him?
16       A.      Well, he produced Jurassic Park,
17       Schindler's List, Minority Report.
18       Q.      Have you ever had any communications with
19       him?
20       A.      No.
21       Q.      Did you have any involvement with Gerald
22       Molen in 2004?
23       A.      No.
24       Q.      Who is David Raines?
25       A.      David Raines is somebody who stole money
```

Page 115

1    from my family, and he used to work for Gerald

2    Molen.

3    Q.        How did you know David Raines?

4    A.        He met my family at a resort in Maui.

5    Q.        What was your relationship with David

6    Raines?

7    A.        He was somebody who I considered at the

8    time a potential mentor in the film business.

9    Ultimately that didn't work out.

10    Q.        Did you convince your mother to invest

11    money with David Raines and Gerald Molen?

12    A.        To the extent -- I -- I don't know that

13    I'm allowed to talk about this, to be quite honest

14    with you.

15    Q.        Why do you say that?

16    A.        Because my mother had to sue him to get

17    her money back, and there are certain agreements in

18    place and I am unaware of the language of them.

19    And I would not want to put her in a position to

20    jeopardize her wellbeing or get her in trouble or

21    myself in trouble.

22    Q.        And what is the agreement, the terms of

23    the agreement that you say prevents you from

24    discussing the project?

25    A.        Well, I just told you, I don't know what

Page 116

1          the agreements are, and that there was litigation

2          because they stole my mother's money, okay?

3                    What don't you understand about that?

4          Q.        What I don't understand is you have to

5          answer my questions today.   And you're not giving

6          me a clear reason as to why you can't answer my

7          questions about the David Raines and Gerald Molen

8          project --

9                    MR. FRISCH:   He gave you --

10         A.        I did give you a clear explanation.   I

11         said that there was litigation, and that

12         unbeknownst to me, I don't know what types of

13         arrangements are in place between the parties, my

14         mother and them.   And I'm not supposed to talk

15         about it.   So to that extent, I cannot talk about

16         it.

17         Q.        What was the name of the project?

18         A.        If you want to find out more information,

19         you can go talk -- what?

20         Q.        What was the name of the project?

21         A.        Sir, I just told you that I cannot discuss

22         this information.   Court ordered, or -- whatever

23         you want to call it.   There's legal ramifications

24         of that and I'm not allowed to discuss it.

25         Q.        Well, if you're not going to answer the

                                              Page 117

```
1      Q.      Were you trying to raise the money for no
2      compensation for -- as a gift to David Rusie?  Or
3      did you expect to be paid?
4      A.      I expected to be compensated for my work,
5      yes.
6      Q.      So how -- how was it that you came to work
7      for Cammarata Management?
8      A.      Michael offered me a job as his executive
9      assistant.
10     Q.      Did you come to Michael and ask him for
11     work?
12     A.      Nope.  He offered it to me.
13     Q.      Why did he offer it to you?
14     A.      Maybe he felt bad for me because I was
15     going through a horrible situation.  I don't know.
16     Why don't you ask him that?  I don't know what was
17     in his head.
18     Q.      Did you consider yourself to be friends
19     when he came and offered you a job, because you
20     said he might have felt bad for you?
21     A.      Absolutely.  We were best friends.
22     Q.      So Michael wasn't your typical boss; he
23     was -- he was a good buddy as well, correct?
24     A.      Well, at least I thought so, yeah.
25                  MR. FRISCH:  Object.  I'll object as
```

Page 124

```
1        that -- I don't know what -- I don't know what was

2        in his head.  He needed -- he needed an assistant,

3        and he chose me, so ...

4        Q.        When you said he was a successful person,

5        what do you mean?

6        A.        Meaning that he had everything, and I

7        was -- he was financially successful.  I had not

8        yet become financially successful.  So I'm just

9        saying, maybe he was helping his friend out, gave

10       his friend a job.  I don't know.

11       Q.        When -- when he was helping his friend

12       out, what -- what job duties did you agree to do

13       back in 2011 when you started doing work for

14       Cammarata Management?

15       A.        I do not recall any specific conversation

16       as to what I agreed to do or not do.  I was

17       learning as I went along.  And I didn't -- I did

18       everything he asked me to do.  You know, we --

19       there is so many things that -- so many different

20       projects and different things and clients and --

21       you know, there was not one specific set of things

22       that said, I agree to only do this.  I did

23       everything that I was asked to do, you know, or

24       that was required of me, as the company grew, and

25       as we took on more projects and more clients so...
```

Page 126

```
 1     Q.        When did you start working for Cammarata
 2   Management in 2011?
 3     A.        November.
 4     Q.        At that time, what payment did you
 5   negotiate?
 6     A.        There was no negotiation.  He didn't even
 7   pay me when I first started working for him.  He
 8   promised me that he would make me a paid employee,
 9   and that over time, he would -- as the company
10   grew, would properly compensate me for my
11   employment.
12     Q.        Was there any agreement as to what you
13   would be paid or how many hours you would work?
14     A.        Yeah.  However many hours he needed me to
15   work.  I was there for him.
16     Q.        So you weren't expected to work any set
17   number of hours, correct?
18     A.        I was -- to be able to work, I was -- I
19   was to be able to work from morning until -- to be
20   quite honest, I was available to him 24/7.  So if
21   you're asking me specifically which hours did I
22   work, I was working from morning till --
23   approximately ten hours a day, every day.
24     Q.        Are you done with your answer?
25     A.        Can you please just clarify specifically
```

Page 127

1        to Cammarata Management having an accountant that

2        they hire, for example, to file tax returns?

3        A.       I don't know how they run their

4        infrastructure, is what I told you.  You know that

5        they had a sophisticated one.  To that extent,

6        that's all I know.

7        Q.       So other than Mike's parents, did you

8        interact with anybody else at Cammarata Management

9        or KM Organic?

10       A.       Sure.

11       Q.       Who?

12       A.       We -- I mean, a lot of people.  I don't

13       remember everyone.  Tons of people.  We were

14       doing -- we have people working for us on film

15       stuff, music stuff.

16       Q.       So to be clear, I'm not asking about

17       projects that Cammarata Management and KM Organic

18       were working on.  I'm asking about -- were there

19       any employees at Cammarata Management and

20       KM Organic that you interacted with other than

21       Michael Cammarata and his parents?

22       A.       I interacted with an employee named -- she

23       handled the books, I believe.  I don't remember her

24       name.  And that -- those were -- you know, I don't

25       remember everyone that I interacted with, but a

Page 143

1      majority of the time I was interacting with his

2      parents or the bookkeeper that they had.

3      Q.      And was the bookkeeper an employee or a

4      contractor?

5      A.      I don't have the answer to that question.

6      I don't know.

7      Q.      So you couldn't remember exactly what you

8      agreed your job duties would be when you first

9      started working with Cammarata Management, but can

10     you describe what those job duties were over the

11     years?

12     A.      I don't remember everything that I did.  I

13     did a lot.

14     Q.      So if you go back to Exhibit -- I think it

15     was 5, the résumé.

16             MR. JOYNER:  Radha, was that

17     Exhibit 5?  Okay, there it is.  Yep.

18             Andrew, you should be able to see

19     that as well.

20             MR. FRISCH:  Yeah.

21     Q.      And you go to page 45, the document

22     control number 45, it says you, quote/unquote,

23     managed the day-to-day scheduling of meetings,

24     phone calls, travel, and anything else.  Correct?

25     A.      Correct.

Veritext Legal Solutions
866 299-5127

```
 1        would ask that you'd ask the question and let him

 2        answer, rather than chopping off the answer by

 3        asking another question.  That's not appropriate

 4        questioning.

 5                    MR. JOYNER:  It's not argumentative.

 6        He's not answering the question.

 7                    MR. FRISCH:  He started speaking.  He

 8        did not answer the question; you started asking a

 9        different question while he was answering the first

10        question.  That's not proper deposition technique.

11                    MR. JOYNER:  I've asked the question

12        five times, and it's as if you have asked him the

13        question as well, and told him how to answer it.

14        He's not answering my question.

15        BY MR. JOYNER:

16        Q.        Mr. Villar --

17        A.        I answered your question.  He told me what

18        to do and I did it.  He told me to book an airline

19        ticket; I booked an airline ticket.  Told me to get

20        him a car; I got him a car.  Told me to make a

21        reservation at a restaurant that he wanted to eat

22        at; I made a reservation for him.

23        Q.        So it's that -- it's that simple.  My

24        question is, once Michael Cammarata expressed his

25        preferred providers, you made the necessary
```

Page 147

1      arrangements, correct?

2      A.      Yes, correct.

3      Q.      Okay.

4      A.      But he was -- things do change over time,

5      so, you know, if he required an adjustment to the

6      way that we handled things, you know, then I would

7      adjust at his direction.

8      Q.      Right.  So if his preferences changed, you

9      would adjust appropriately and handle the task,

10     correct?

11     A.      Yeah.  Whatever he asked me to do, I did.

12     Q.      So it also discusses in the résumé -- I

13     think Radha has it up here, and you've got it in

14     front of you.  I think we're on the same page.

15             But in what way did you liaise between the

16     CEO and -- and clients regarding plan accounts and

17     new business?

18     A.      Okay.  So this isn't the final résumé that

19     I -- that I ended up furnishing to people.  So you

20     got -- you had asked for different versions of it,

21     and these are just -- these are just, you know --

22     this was -- this isn't like the gospel when it

23     comes to what exactly I did.

24     Q.      Hmm.  So are some of the things on this

25     page not accurate, under the -- under the heading

Page 148

```
1        independent album, they had me work with -- at
2        Mike's direction, work with specific writers and
3        producers to organize recording sessions for
4        Kendall, writing sessions.
5               When -- at one point Kendall had to go to
6        New York to do a Thanksgiving Day parade, and I
7        worked with the agents that were involved with --
8        with that show, and producers, production
9        coordinators, to execute a schedule for Kendall,
10       travel, from the second he stepped foot on the
11       ground in New York, to the car that he got into, to
12       the hotel that he stayed at, to the time he was
13       going to go out of the hotel to get his car to go
14       down to the fair, when he was getting on the float,
15       who was going to be there, his security team, stuff
16       like that.  We worked with Party Down South for a
17       while.  I had to do a lot of stuff for them.
18              What else?  I don't know.  I just don't
19       remember everything.
20   Q.      Were you able to turn down work
21       assignments for Cammarata Management?
22   A.      Like what do you mean?
23   Q.      If you were asked to work on a project,
24       could you say yes or no?
25   A.      I typically -- I did everything that was
```

Page 160

1   ever asked of me, and if I didn't know how to do

2   it, I would say I didn't know how to do it.  But if

3   I could try to learn how to do it, or thought that

4   it was something that I would be capable of, within

5   the capacity of my ability, then I always did it

6   for him.

7   Q.      Is there anything in particular that you

8   remember that you felt like you didn't have the

9   skills to perform?

10  A.      In regards to Cammarata Management?

11  Q.      Yes.

12  A.      No.

13              MR. JOYNER:  Let's introduce

14  Exhibit 6.

15              (EXHIBIT NO. 6, e-mail from

16  Christopher Villar dated January 14, 2015, was

17  marked for identification and attached

18  hereto.)

19              MR. FRISCH:  Just as a heads-up, it's

20  5:45 now.  If you're going to a new exhibit, maybe

21  this is a good time.

22              MR. JOYNER:  We'll just go ahead,

23  since we've already introduced it, and it's been

24  uploaded.  We'll go ahead and go through it, and

25  then we can take a break for dinner.

Page 161

```
 1                    MR. FRISCH:  That's fine.  Okay.
 2        BY MR. JOYNER:
 3        Q.        Do you recognize this document?
 4        A.        Yeah.  This is when -- this is when Mike
 5        tried to get me to do something for Schmidt's that
 6        I didn't feel comfortable doing, that I'd never
 7        done before.
 8        Q.        And in the e-mail, Michael Cammarata is
 9        asking you to help with data entry work for
10        Schmidt's, correct?
11        A.        Well, the team that he had told Jaime that
12        I would be able to help with it, yes.
13        Q.        Had you done work for Schmidt's before
14        this e-mail?
15        A.        You know, I -- this is so -- this is so
16        far back that I don't remember exactly -- if I
17        remember anything at all, I don't even -- I think
18        that Mike had just gotten involved with this
19        company around this time.  So I think that up until
20        this point, I was -- I -- I believe that I had been
21        just 100 percent focused on entertainment stuff,
22        so ...
23        Q.        Do you see in the e-mail chain one reason
24        you gave for not wanting to perform the data entry
25        work for Schmidt's was that you were,
```

Page 162

1        quote/unquote, "an independent contractor, not an

2        employee of Schmidt's Deodorant," closed quote?   Do

3        you see that?

4        A.        Yes, I do.

5        Q.        Why did you say you were an independent

6        contractor?

7        A.        Because Mike continued to treat me as an

8        employee.  I worked as an employee, but he paid me

9        as if I was an independent contractor.  And if I

10       remember correctly at this point in time, I was

11       sick and tired of being taken advantage of, doing

12       work as an employee but being treated and paid --

13       underpaid as an independent contractor and not

14       being properly compensated.

15              So I also here -- it looks like I had some

16       issues with potential legal ramifications for --

17       for doing something for a company that -- you know,

18       without them actually making me an employee.  So,

19       you know, he had always -- he had always told me

20       that he would eventually pay me as an employee,

21       officially compensate me properly for the work I

22       was doing, the hours I was working as an employee.

23              So here I am taking a stand for myself, it

24       seems like.  Like, "You want me to continue doing

25       work as an employee, then you've got to stop paying

Page 163

```
 1      A.      Yes.

 2      Q.      Is that accurate?

 3      A.      I believe so, yes.

 4      Q.      So you worked 60 hours in each of those

 5   weeks?

 6      A.      Yep.

 7      Q.      And you stated earlier, you have no record

 8   of the actual hours you worked, correct?

 9      A.      If I did -- you know, there was time spent

10   in e-mails.  There's time spent on the phone.

11   There's time spent in communication with Mike.

12   Time spent on his personal stuff.  Tons of time

13   spent on Schmidt's stuff.

14           So, you know, in regards to what I spent

15   my time on, specifically, I -- you know, that --

16   I -- that's really hard for me to quantify.  But I

17   do believe that over the course of my time, and

18   within this chart, that on average, the time that I

19   spent working for -- employed by Michael Cammarata

20   and his companies, that that would be equivalent

21   of -- yes, 60 hours in all these weeks so...

22      Q.      If you did not keep any record of the

23   actual hours you worked each week, how did you base

24   your calculation that you in fact did work 60 hours

25   every week?
```

Page 178

1    A.      Judging by the fact that I would wake up

2    very early and not be done working until pretty

3    late at night, and the times that I spent on the

4    weekends.

5    Q.      Did you work the same amount of hours

6    every day?

7    A.      So every day was different.  So some days

8    could have been more hours than others, but on

9    average, when it's all put together, it would come

10   out to be about 60 hours a week.

11   Q.      Do you have any documents to support this

12   calculation as set out on the chart in this

13   exhibit?

14   A.      I've got -- you know, I could go back and

15   I could look at the -- the time stamps on -- on

16   e-mails or phone calls to or from Mike, you know,

17   then one look at when the last one is sent for the

18   day.

19   Q.      I thought you said you did not have any

20   e-mails.

21   A.      I don't have any e-mails.  Those e-mails

22   are --

23   Q.      So how did you -- on what document did you

24   base this calculation that -- on the chart?

25                  MR. FRISCH:  Misstates the prior

Page 179

```
 1          bathroom and eat food however many times a day.
 2          Q.       So other than eating and going to the
 3          bathroom, you're saying every one of these weeks on
 4          the chart, you worked every minute in the day from
 5          the time you woke up and went to sleep?
 6          A.       That's -- that's not what I said.  Every
 7          minute of the day would -- that's ridiculous.
 8          Q.       Okay.
 9          A.       You're talking about a 24-hour period of
10          time.  I'm saying I worked 10 hours a day, on
11          average.
12          Q.       Did you receive W-2s from Cammarata
13          Management?
14          A.       No, I did not, because he improperly paid
15          me as a contractor.
16          Q.       Did you receive W-2s from KM Organic?
17          A.       I did not, because they improperly paid me
18          as an independent contractor.
19          Q.       Did you receive 1099s from your employment
20          with Cammarata Management and KM Organic?
21          A.       Yes, I did, because they improperly were
22          improperly paying me --
23                   MR. JOYNER:  Let's enter Exhibit 8.
24          A.       What?  What?  What was the question?
25          Q.       We're introducing Exhibit 8.
```

Veritext Legal Solutions
866 299-5127

```
 1          liability?
 2     A.        Why would I be concerned?  I didn't do
 3     anything wrong.  They're the ones breaking the law,
 4     not me.
 5     Q.        So you just stated earlier that
 6     KM Organics was not somebody you worked for, but on
 7     your résumé, it says you started working for
 8     KM Organics in January of 2015.  Can you please
 9     explain that discrepancy.
10     A.        So that's probably when they started
11     paying me from KM Organic, and when I took over
12     handling or performing all the executive assistant
13     duties that were -- were needed when Mike took over
14     Schmidt's.  So -- KM Organic owned Schmidt's.
15     Q.        So do you recall your first day of work
16     for KM Organic?
17     A.        No, I do not.
18     Q.        Did you have to go in -- through any
19     training with KM Organic?
20     A.        I do not recall specifically the training
21     that I -- or learning curve that came about when
22     Michael got involved with Schmidt's.  But there
23     was -- there was a time where I had to learn new
24     things and adapt to that new situation, as he was
25     going from being a CEO of a -- of an entertainment
```

1   company to being an executive at a manufacturing

2   company.

3           So it was all -- it was all new.  I had to

4   learn a lot of things.  I had to be trained to

5   learn a lot of new things.

6   Q.        When you started working for KM Organic

7   and when you started working for Cammarata

8   Management, were you required to review or agree to

9   comply with any employee handbook?

10  A.        I don't know that their companies even had

11  one.

12  Q.        Were there any policies from KM Organic or

13  Cammarata Management that you had to accept?

14  A.        If they -- if --

15              MR. FRISCH:  Objection.  Vague.

16              You can answer.

17  A.        I mean, as a company, I would think that

18  that's something that they either do or don't, to

19  their discretion.  So I don't believe that that was

20  something that they did.  Otherwise I would have,

21  you know, probably received that.

22  Q.        Did Cammarata Management or KM Organic

23  ever write you up for discipline?

24  A.        Michael got mad at me, you know, for

25  certain things, but he would come to me and speak

```
1      to me about the issues.  Since he was the boss,
2      there was no one to write me up to.
3      Q.       Right.  Were there any performance
4      reviews?
5      A.       I'm sure they probably -- probably.  I
6      don't know how they ...
7      Q.       Was there a formal process for reviewing
8      your performance, where you would be interviewed
9      regarding your performance and provided feedback on
10     your performance?
11     A.       I don't recall any specific situation
12     where I sat down and -- that formal.  We had many
13     discussions about, you know, my performance and
14     what was expected of me and such.
15                  MR. JOYNER:  Let's go ahead and
16     introduce Exhibit 10.
17                  (EXHIBIT NO. 10, text messages,
18     was marked for identification and attached
19     hereto.)
20     BY MR. JOYNER:
21     Q.       Do you recognize this document?
22                  MR. FRISCH:  Our copy is not up yet
23     on the screen.
24                  MR. JOYNER:  Yeah, I'm just asking
25     him if he recognizes it.  It says it's uploading.
```

Veritext Legal Solutions
866 299-5127

```
 1        A.        He was my boss, my friend, and my business

 2        partner.

 3        Q.        So when you would fly to see Mike as a

 4        friend, would you pay for your own flight?

 5        A.        So -- I don't understand the question.

 6        Q.        In these text messages, you talk about

 7        scheduling a flight to come see Mike, and that your

 8        girlfriend or fiancée is upset about you leaving to

 9        travel to Florida, correct?

10        A.        Yes.

11        Q.        And on page 2823 you discuss how you would

12        prefer to come on a certain week because the

13        flights are cheaper.  Do you see that?

14        A.        Yeah, because -- yeah, because Mike's too

15        cheap.  He wouldn't pay for my plane ticket down

16        there.

17        Q.        So you were paying for your own plane

18        ticket, correct?

19        A.        Yeah.  It's unfortunate.

20        Q.        If you turn to page 2842 on this exhibit.

21                  Let me know when you're there.

22        A.        Yep.

23        Q.        So if you look at the -- the large text on

24        October 3, 2017, at 8:09 a.m., from Chris Villar.

25        Do you see that?
```

```
1       30 hours a week, including weekends, on Schmidt's,

2       after Janelle Morea --

3       A.       It says as of August 5th, as of

4       August 5th, it looks like as of August 5th, I was

5       spending --

6                 MR. FRISCH:  Can we get the relevant

7       page you guys are talking about up on the screen?

8                 MR. JOYNER:  For the record, it's

9       page KM1002.

10                MR. FRISCH:  Okay.

11      A.       So it appears to me that as of August 5th,

12      I am telling her that I am spending a total of

13      30 hours a week on Schmidt's.

14      Q.       Okay.

15                MR. JOYNER:  Let's introduce the next

16      exhibit, 24.

17      A.       Which, by the way, did not include

18      Michael's personal things that I just -- what

19      number?

20      Q.       Exhibit 24.

21                (EXHIBIT NO. 24, e-mail from

22      Janelle Morea dated 7/17/2017, was marked for

23      identification and attached hereto.)

24      BY MR. JOYNER:

25      Q.       Do you recognize this document?
```

Page 209

```
 1        still continued doing my tasks, at which point

 2        the -- the hours that I was spending on Schmidt's

 3        reduced from 40 to 30.  I do not remember at what

 4        point, but I do remember that Michael said that he

 5        was hiring her to help me because there was such a

 6        tremendous amount of work.

 7                 So, believe me, there was plenty work to

 8        go around.  So just because he was delegating tasks

 9        to her didn't mean he still wasn't delegating tasks

10        to me.

11        Q.        During this time in 2017, did you have any

12        other of your own projects that you were working

13        on?

14        A.        No.

15        Q.        Okay.  But earlier you had mentioned that

16        you, in October of 2017, were sending a text

17        message to Michael about getting other jobs because

18        you were waiting for a payout.  What payout were

19        you referring to?

20        A.        Can you identify that you're speaking to

21        the text message on KMO0002842?

22        Q.        That's correct.

23        A.        Okay.  Well, as I said when you asked me

24        the question the first time, I was referring to the

25        money that my company was to receive from the sale
```

Page 211

```
 1          of Schmidt's Naturals.
 2     Q.        And what company was that?
 3     A.        Virtual Mountain Capital.
 4     Q.        And --
 5     A.        I think you know -- I think you know my
 6     company.
 7     Q.        When I asked you if you were working on
 8     any other ventures of your own in 2017, was the
 9     Virtual Mountain --
10     A.        Well, that was -- that was an investment
11     that was made back in 2015 that didn't require any
12     attention.  In fact, me working on Schmidt's and
13     helping Schmidt's Naturals grow --
14     Q.        Go ahead.  Continue.
15     A.        I don't have anything else to say about
16     that.
17     Q.        So I missed the end of that, but I think
18     what you were saying was you working on Schmidt's
19     and helping Schmidt's Naturals grow would help the
20     VMC deal?
21     A.        Well, sure, because the more money that
22     Schmidt's made when it was sold, the more money I
23     would make, my company.
24     Q.        Right.  And that company you're referring
25     to --
```

Page 212

1  A.       So because -- so because he kept changing

2  his story on who was going to be potentially

3  purchasing, when they might potentially be

4  purchasing, when they might sell, when they might

5  not sell, I had to quickly adjust and get a job

6  that paid me more money than the one that I

7  currently had, because as my employer, he refused

8  to pay and compensate me properly.  And I could not

9  continue to live on $169 a week.

10        So, yes, I went out and got a different

11  job, and I left the company in 2017.  And to this

12  day, I still don't have my money from the sale of

13  Schmidt's Naturals, because Cammarata has concocted

14  a plan with you to try to defraud me from that

15  money.

16  Q.       So when you say some of the stuff you were

17  working on for Schmidt's Naturals would have

18  benefited Virtual Mountain Capital, what -- what

19  projects are you talking about?

20  A.       I wasn't talking about any specific

21  projects.  The more I -- the better job I did in my

22  employment for Mike, and -- and more that I made

23  him -- his job easier as an executive in his

24  day-to-day run smoother, more efficiently, and --

25  and to be more productive, yes.  In the end, that

```
 1                        MR. JOYNER:  Well, if you would have

 2            appeared on March 9th in person, we wouldn't have

 3            to be doing this.

 4            BY MR. JOYNER:

 5            Q.      So do you recognize the document, Chris

 6            Villar?

 7            A.      It looks as if -- I don't -- it looks like

 8            I wrote an e-mail, so ...

 9            Q.      Yep.  Do you remember who Express Trade

10            Capital was?

11            A.      Express Trade Capital.  I don't remember

12            exactly what -- I don't remember exactly what this

13            company did, off the top of my head, no.

14            Q.      So does the Subject line of the e-mail

15            refresh your recollection?  It says "Beauty Product

16            Client Referral."

17            A.      No, it does not refresh my recollection.

18            Q.      Is this the type of work you were talking

19            about that if some of these deals had gone through

20            that you were facilitating, that it would have

21            benefited Virtual Mountain Capital?

22            A.      I don't understand your question.

23            Q.      So if a successful deal had been reached,

24            with Drew Dugan and his company -- I'm sorry, Drew

25            Cohen and his company -- would that have benefited
```

Page 215

1    Schmidt's Naturals and therefore benefited Virtual

2    Mountain Capital?

3    A.      Well, that's kind of a broad statement.

4            Specifically, any and all profits that

5    KM Organic Fund was to receive through its

6    ownership of Schmidt's Naturals technically should

7    have flowed -- flowed down through its alleged

8    equity owner, which was represented to me,

9    Strategic Capital Partners, and then to my company.

10   So if --

11   Q.      So if -- go ahead.

12   A.      No.  You continue.

13   Q.      Yeah.  So if -- if a deal you were

14   facilitating increased Schmidt's --

15   A.      No.  No, whatever I was doing here as an

16   employee is what I was doing as an employee, okay?

17   And I wasn't facilitating any deals for -- for

18   Schmidt's.  I was only working under the direction

19   of Michael Cammarata, to communicate with these

20   various people that were interested in potentially

21   doing a deal with Schmidt's.  I was not sourcing

22   any deals for Schmidt's.

23   Q.      So I didn't ask if you were sourcing

24   deals.  And when I said --

25   A.      Okay, well, that's what it sounded like

Veritext Legal Solutions
866 299-5127

```
 1        meetings between Schmidt's Naturals and Goldman
 2        Sachs?
 3        A.      I -- at the direction of Michael, I
 4        communicated with these people and coordinated
 5        meetings and phone calls.
 6        Q.      And again, is this another one of the
 7        situations where you referred to your work in
 8        setting up these meetings, if the meetings had been
 9        successful, the meeting -- that the deals reached
10        in these meetings could have benefited Virtual
11        Mountain Capital?
12        A.      So my work in setting up one of these
13        meetings is -- the only benefit I'm getting from
14        that is my measly $169 a week for all this work
15        performed, okay?  So in fact my benefit was to be
16        underpaid and taken advantage of every single week
17        for my work in putting together these --
18        coordinating these phone calls and meetings for
19        Michael.
20               Now, should Michael have reached a
21        successful deal, and -- with these people and sold
22        the company, then, yes, my company, Virtual
23        Mountain Capital, would have benefited from it.
24        But he stole that, too, so ...
25                    (Reporter clarification)
```

Page 218

```
 1        but I didn't receive an e-mail at the time.  We're

 2        good.

 3                      MR. JOYNER:  Now 13 is up.

 4                      (EXHIBIT NO. 13, e-mail from

 5        Jeff Doiron dated 12/25/2016, was marked for

 6        identification and attached hereto.).

 7        BY MR. JOYNER:

 8        Q.        Mr. Villar, do you recognize this to be an

 9        e-mail from you to Jeff Doiron at Fuel Industries?

10        A.        It looks like it's an e-mail from Jeff

11        Doiron to me, yes.

12        Q.        I'm sorry, I correct myself.  Yes, an

13        e-mail from you -- from Jeff Doiron to you.

14                  Why was Jeff Doiron sending you an e-mail?

15        A.        Well, it appears that he was responding to

16        Michael's offer for free -- free Schmidt's stuff.

17        And -- and the holiday greetings, he requested that

18        if you wanted to have an any samples sent to you,

19        that you just -- I need to send his assistant,

20        Chris Villar, your address, and he would have one

21        shipped out to you right away.  So that --

22        Q.        Okay.  Are you coordinating the delivery

23        of the samples to whoever requested them?

24        A.        Yes.  I am sending the requests --

25        coordinating with the warehouse and a tracking
```

Page  223

1        facility to have these requests facilitated and --

2        facilitated and shipped to these various people.

3     Q.       So Michael Cammarata asks you to get this

4     done, and you got it done.

5     A.       Correct.

6     Q.       You got it sent out.

7                    MR. JOYNER:  Can we introduce

8     Exhibits 13  through 16, because they're all

9     related.

10                   (EXHIBIT NO. 14, e-mail from

11    Christopher Villar dated 12/25/2016, was

12    marked for identification and attached

13    hereto.)

14                   (EXHIBIT NO. 15, e-mail from

15    Michael Cammarata dated 7/17/2017, was marked

16    for identification and attached hereto.)

17                   (EXHIBIT NO. 16, e-mail from

18    Tanya dated 12/26/2016, was marked for

19    identification and attached hereto.)

20                   MR. JOYNER:  Okay.  It looks we have

21    the first one up, Exhibit 13, and Andrew will

22    probably get the others by e-mail.

23    BY MR. JOYNER:

24    Q.       And Exhibits 13, 14, 15, and 16, are these

25    e-mails related to holiday samples that -- and

Page 224

```
 1          BY MR. JOYNER:

 2          Q.       So he interrupted you right when I asked

 3          you why you no longer have access to your Cammarata

 4          Management e-mail.

 5          A.       I no longer have access to my Cammarata

 6          Management e-mail because I no longer work for

 7          Cammarata Management, and I don't have access to

 8          that ever since I left the company.

 9          Q.       Did you not have a laptop that had your

10          Cammarata Management e-mails on it?

11          A.       You specifically are asking me about

12          communications between me and INscribe Digital

13          regarding Cammarata Management's book distribution

14          partnership.  And I don't have access to those

15          communications, as they are -- were made through my

16          CMIstaff.com account.  So I can't be responsive and

17          produce those communications when I don't have

18          them.

19                      MR. JOYNER:  Let's go ahead and --

20          well, let me finish with that.

21          Q.       So where is the laptop you used when you

22          worked for Cammarata Management and KM Organic?

23          A.       Are you asking -- you're asking -- okay.

24          If you're referring to a laptop that was purchased

25          and -- by me, with my own debit card, at Best Buy,
```

1      which they did reimburse me for a portion of it,

2      which was a benefit of my employment -- if you're

3      asking about that laptop, can you please verify?

4      Because I had a laptop before that.

5      Q.      Yes.  I'm asking -- I am asking about that

6      laptop.  But if there were others, please tell me

7      about the other computers as well.  But let's start

8      with that laptop that you purchased at Best Buy.

9      A.      Well, that laptop was purchased in 2012.

10     Q.      Where is that laptop today?

11     A.      In a landfill somewhere.

12     Q.      When did you send it to the landfill?

13     A.      Sometime in 2017.

14     Q.      When in 2017?

15     A.      I don't remember exactly.  Towards the end

16     of the year.

17     Q.      When did you stop working for KM Organic

18     in 2017?

19     A.      October.

20     Q.      So was it after October that you threw the

21     laptop away?

22     A.      I don't remember exactly, but I don't

23     believe so.

24     Q.      Was it before October that you threw the

25     laptop away?

Page 235

```
 1        A.        Sounds likely, yes.

 2        Q.        How were you sending e-mails in October of

 3   2017 for your work with KM Organic?

 4        A.        Well, my phone has e-mail capabilities.

 5        Q.        Why did you throw the laptop away before

 6   October of 2017?

 7        A.        I -- I disposed of the laptop because it

 8   was no longer working, and I didn't have a need for

 9   a broken five-year-old laptop.

10        Q.        When you threw the laptop away, did you

11   tell Michael Cammarata you had thrown the laptop

12   away?

13        A.        When he had asked about it, I told him

14   that I did.  But when I did --

15        Q.        At the time --

16        A.        I did throw it away.  Sorry, go ahead.

17        Q.        You're talking over me.

18                  At the time you threw the laptop away, at

19   that time, did you tell Michael Cammarata you were

20   throwing it away?

21        A.        I did not believe that I needed to make

22   him aware that I was throwing away something that

23   was a benefit of my employment that I purchased

24   with my own debit card, and was registered to me,

25   that I ran off my server at my house.  You know, it
```

Veritext Legal Solutions
866 299-5127

1    was -- so I didn't think that I had to make him
2    aware.  And --
3    Q.      So you had signed at least one
4    nondisclosure agreement -- I think two, correct?
5    -- when you were working for Cammarata Management
6    and KM Organic?
7    A.      I believe that I had signed one
8    nondisclosure agreement, yes.
9    Q.      And did you think you needed to back up,
10   delete, or return that laptop to Cammarata
11   Management before you threw it away, because there
12   was confidential information on it?
13   A.      Okay.  Well, first of all, anything that I
14   would have had on that computer, Michael would have
15   had a copy of.  Most of my work was -- was through
16   e-mails anyway.  So there was nothing on there
17   that -- second of all, I couldn't back anything up
18   because the hard drive was failing.  So there
19   was -- and third of all, I did not believe that I
20   needed to make him aware that I was disposing of a
21   malfunctioning device that was five years old that
22   I was told was a benefit of my employment.
23          So, therefore, I did not -- did not -- was
24   not aware that the cost of the laptop ever had to
25   be paid back or the laptop itself had to be

```
 1          move toward producing?
 2          A.       I guess, yes.  I mean, I think the last --
 3          yeah, I still was.  Yeah.
 4          Q.       Did you make professional connections as
 5          an actor or a producer when you were in film
 6          school?
 7          A.       Sure.
 8          Q.       Was that one of the things that you hoped
 9          to achieve while attending film school, were these
10          professional connections?
11          A.       Well, you know, as with any industry, the
12          idea is put yourself in the right place.  So when
13          it came to making movies, attending a film school
14          in Hollywood was -- was the ideal situation to
15          further one's career in that field.  It made the
16          most sense, so -- anyone would have done that.
17          Q.       Did you receive any other certificates or
18          degrees other than the GED?
19          A.       No, sir.
20          Q.       Did you graduate from the Los Angeles Film
21          School?
22          A.       I did not.
23          Q.       So -- so we'll get into your work for
24          Cammarata Management and KM, but let's go back to
25          where you worked prior to working for Cammarata
```

Page 58

```
 1              When you mention "Mike," are you referring
 2       to Michael Cammarata?
 3       A.      Yes.
 4       Q.      So -- so other than the Suburban Jungle --
 5       let's just call it "the lawsuit project" -- and
 6       what you referred to as Cammarata Management film
 7       projects, are there any other film projects that
 8       you worked on?
 9       A.      As like a producer, trying to put stuff
10       together?
11       Q.      Yes.
12       A.      Outside of -- oh, yeah.  I had been
13       working on a project called -- well, it went
14       through various different names, but eventually it
15       was turned into a book series.  It's called the
16       Indigo Project.
17       Q.      Any others?
18       A.      I worked on -- I mean, now, as a producer
19       or as just somebody working on a film project?
20       Because I -- when I worked for Mike, we worked on a
21       lot of different film-related projects; but in
22       terms of me being a producer, you know, it was the
23       Suburban Jungle, and then it was the Indigo
24       Project.
25       Q.      Right.  So right now we're referring to
```

Page 90

```
1          what you called you acting as a producer,

2          quote/unquote, putting stuff together.

3     A.        Okay.  Yeah.  Just those two projects.

4          Some stuff that I did in film school that...

5     Q.        You say two projects, but I have three

6          projects where you were acting as a producer.  I

7          have the Suburban Jungle, the lawsuit project, and

8          the Indigo Project.  Correct?

9     A.        Yeah.  Well -- yeah.

10    Q.        Yeah.  And in film school, were you acting

11         as a producer on those projects in film school that

12         you just mentioned?

13    A.        No, I was just more or less helping people

14         raise money.  The only projects I was producing was

15         Suburban Jungle and the Indigo Project.

16    Q.        So, so far in this category of

17         entrepreneurial and film projects, you know, we've

18         talked about you acting as an individual producer

19         and somebody experienced in helping people raise

20         funds, correct?

21    A.        I don't know how experienced I really am,

22         but, yeah, I was attempting to do that.

23    Q.        So with respect to being a producer and

24         putting stuff together, what made you want to do

25         that?
```

```
1              MR. FRISCH:  Just for the record, I
2      think counsel is misstating the nature of the
3      requests.
4              MR. JOYNER:  You're, again, speaking
5      instruction, and you're leading my witness, Andrew.
6      Q.      You can answer the question.
7      A.      I'm -- I'm unclear as to what exactly
8      you're -- you're referring to, because as far as I
9      know, I sent -- okay.  If you're referring to any
10     communications regarding work done on that project,
11     I don't have that -- that -- I don't have that.
12     That was all done through CMI's e-mail address.
13     Mike has control over all that.  I don't have
14     access to those communications.
15             In regards to the check from KM Organic
16     Fund for $50, I have that.  I'd be more than happy
17     to show it.  You know, I don't know why it came
18     from KM Organic, because as far as I understand,
19     KM Organic had nothing to do with the book; it was
20     Cammarata Management.
21             And the price of the book, and the book
22     itself, I'm sure you can order it somewhere.  I --
23     I don't -- you know.  I don't have any of that
24     work.
25     Q.      Okay.  Is there any reason why you did not
```

Page 107

```
 1        that -- I don't know what -- I don't know what was

 2        in his head.  He needed -- he needed an assistant,

 3        and he chose me, so ...

 4        Q.        When you said he was a successful person,

 5        what do you mean?

 6        A.        Meaning that he had everything, and I

 7        was -- he was financially successful.  I had not

 8        yet become financially successful.  So I'm just

 9        saying, maybe he was helping his friend out, gave

10        his friend a job.  I don't know.

11        Q.        When -- when he was helping his friend

12        out, what -- what job duties did you agree to do

13        back in 2011 when you started doing work for

14        Cammarata Management?

15        A.        I do not recall any specific conversation

16        as to what I agreed to do or not do.  I was

17        learning as I went along.  And I didn't -- I did

18        everything he asked me to do.  You know, we --

19        there is so many things that -- so many different

20        projects and different things and clients and --

21        you know, there was not one specific set of things

22        that said, I agree to only do this.  I did

23        everything that I was asked to do, you know, or

24        that was required of me, as the company grew, and

25        as we took on more projects and more clients so...
```

Page 126

1    Q.        When did you start working for Cammarata

2    Management in 2011?

3    A.        November.

4    Q.        At that time, what payment did you

5    negotiate?

6    A.        There was no negotiation.  He didn't even

7    pay me when I first started working for him.  He

8    promised me that he would make me a paid employee,

9    and that over time, he would -- as the company

10   grew, would properly compensate me for my

11   employment.

12   Q.        Was there any agreement as to what you

13   would be paid or how many hours you would work?

14   A.        Yeah.  However many hours he needed me to

15   work.  I was there for him.

16   Q.        So you weren't expected to work any set

17   number of hours, correct?

18   A.        I was -- to be able to work, I was -- I

19   was to be able to work from morning until -- to be

20   quite honest, I was available to him 24/7.  So if

21   you're asking me specifically which hours did I

22   work, I was working from morning till --

23   approximately ten hours a day, every day.

24   Q.        Are you done with your answer?

25   A.        Can you please just clarify specifically

Page 127

1          what you're asking me?

2     Q.        Yeah.  I just saw you thinking, as if you

3     were going to clarify or continue with your answer.

4              The question was, so you weren't expected

5     to work any set number of hours, correct?

6     A.        That's not true.  I was expected to

7     perform as a full-time employee.  And our hours

8     varied.  Our hours varied.

9     Q.        Okay.  So there were no set number of

10    hours; the hours varied that you worked for

11    Cammarata Management.  Correct?

12    A.        Correct.  And that is in regards to like

13    clocking in somewhere and clocking out somewhere.

14    So it wasn't like I showed up at a building and,

15    you know, say, okay, I'm clocking in right now, and

16    I'll leave at a certain time.

17             The nature of our business and our work

18    was unconventional.  So the amount of hours that I

19    spent every day working for him was -- it varied.

20    And it was directed and hinged upon him, as the CEO

21    of the company, and whatever it was that he was

22    doing.  So, you know, I'm his right hand; he moves,

23    I move.  He was always moving.  I was always

24    working.

25    Q.     But as I understand this, this isn't like

Page 128

1       arrangements, correct?

2       A.      Yes, correct.

3       Q.      Okay.

4       A.      But he was -- things do change over time,

5       so, you know, if he required an adjustment to the

6       way that we handled things, you know, then I would

7       adjust at his direction.

8       Q.      Right.  So if his preferences changed, you

9       would adjust appropriately and handle the task,

10      correct?

11      A.      Yeah.  Whatever he asked me to do, I did.

12      Q.      So it also discusses in the résumé -- I

13      think Radha has it up here, and you've got it in

14      front of you.  I think we're on the same page.

15              But in what way did you liaise between the

16      CEO and -- and clients regarding plan accounts and

17      new business?

18      A.      Okay.  So this isn't the final résumé that

19      I -- that I ended up furnishing to people.  So you

20      got -- you had asked for different versions of it,

21      and these are just -- these are just, you know --

22      this was -- this isn't like the gospel when it

23      comes to what exactly I did.

24      Q.      Hmm.  So are some of the things on this

25      page not accurate, under the -- under the heading

                                               Page 148

```
 1         of "Executive Assistant to the Chief Executive

 2         Officer, CMI Entertainment"?

 3                  If there's something not accurate on

 4         there, tell me now.

 5         A.        That is not true.  Specifically, in fact,

 6         I -- I made an effort to make this as most accurate

 7         as humanly possible, okay?

 8                  So in regards to "liaised between CEO and

 9         clients regarding client accounts and new

10         business," okay, well, that would be in reference

11         to big-time rush clients.  And new business -- so,

12         for instance, there was a time when I was helping

13         Kendall Schmidt get sponsorships for -- for

14         equipment, music equipment.  And I would go in

15         between Mike and the clients regarding that new

16         business.  And so, I mean, that's just one example.

17         Q.        Okay.  That's a great example.  How did

18         you seek out the sponsorships for Kendall Schmidt?

19         I don't remember -- I don't remember what

20         instrument Kendall played, but I assume it was

21         maybe a --

22         A.        Sorry, go ahead.

23                  He played the guitar, I believe.

24                  So what was the question again?  I'm

25         sorry.
```

Page 149

1    Q.       On any of these bullet points, could you

2    remember how many hours a week you worked?

3    A.       Collectively -- collectively, all of my

4    tasks took up about 60 hours a week of my time.

5    Q.       But I thought you just said you couldn't

6    remember.

7    A.       Well, you're asking me specifically how

8    many hours did I spend on each task.  So --

9    Q.       Correct.

10   A.       -- I don't know how many hours I spent on

11   each task each day.  I don't even remember what I

12   ate for dinner last week.  So, you know, there was

13   a period where I was required to go in to the

14   office, and so I would sit in the office and -- and

15   do -- do work, and --

16   Q.       Say that again?

17   A.       I said there was a time period in 2012

18   where I was required to drive to an office in

19   Los Angeles to perform duties there outside of the

20   duties that I did outside of the office.

21   Q.       Are those duties included in these bullet

22   points on Exhibit 5 that we're looking at?

23   A.       Sure.

24   Q.       And what percentage of time did you work

25   in that office on these tasks?

Page 172

```
 1          bathroom and eat food however many times a day.
 2          Q.      So other than eating and going to the
 3          bathroom, you're saying every one of these weeks on
 4          the chart, you worked every minute in the day from
 5          the time you woke up and went to sleep?
 6          A.      That's -- that's not what I said.  Every
 7          minute of the day would -- that's ridiculous.
 8          Q.      Okay.
 9          A.      You're talking about a 24-hour period of
10          time.  I'm saying I worked 10 hours a day, on
11          average.
12          Q.      Did you receive W-2s from Cammarata
13          Management?
14          A.      No, I did not, because he improperly paid
15          me as a contractor.
16          Q.      Did you receive W-2s from KM Organic?
17          A.      I did not, because they improperly paid me
18          as an independent contractor.
19          Q.      Did you receive 1099s from your employment
20          with Cammarata Management and KM Organic?
21          A.      Yes, I did, because they improperly were
22          improperly paying me --
23                       MR. JOYNER:  Let's enter Exhibit 8.
24          A.      What?  What?  What was the question?
25          Q.      We're introducing Exhibit 8.
```

Page 182

```
 1            helped you prepare your tax returns?
 2       A.        My personal tax returns?
 3       Q.        Yes.
 4       A.        I mean, I might have gotten to H&R Block
 5       one year, but I really don't remember.
 6       Q.        And what about tax returns for your
 7       company?
 8       A.        Which company?
 9       Q.        Any of your companies.
10       A.        Is there a specific period of time, or ...
11       Q.        No, any accountant you've used to prepare
12       tax returns for any of your companies.
13       A.        I don't know -- I mean, it's possible that
14       I used an accountant, but I don't remember
15       specifically if she was like an accountant or if
16       she was just somebody who helped with taxes.  So I
17       don't know --
18       Q.        What was her name?
19       A.        I don't -- I don't remember off the top of
20       my head.
21       Q.        According to the 1099s, you stopped
22       working for Cammarata Management in 2014, correct?
23       A.        I don't remember at which point he began
24       paying me from KM Organic Fund, but I always worked
25       for Cammarata Management.  And even up until the
```

Page 185

```
 1          Q.       So we have Exhibit --
 2                    MR. JOYNER:  Do you have them now,
 3          Andrew, Exhibit 20 and 21?
 4                    MR. FRISCH:  Yeah.
 5          Q.       So, Mr. Villar, Exhibits 20 and 21, are
 6          these also e-mails between you and potential
 7          investors in Schmidt's Naturals?
 8          A.       These are e-mails -- these e-mails -- how
 9          many of these do you want me to look through before
10          I start speaking to them?
11          Q.       There's two e-mail chains, Mr. Villar.  I
12          mentioned Exhibits 20 and 21.  Are those e-mail
13          chains e-mails between you and potential investors
14          in Schmidt's Naturals?
15          A.       I don't recall exactly what some of the
16          partners did, but it is possible that these people
17          that I was communicating with on behalf of Michael
18          were potential part -- investors or buyers in
19          Schmidt's Naturals, yes.
20          Q.       And the next exhibit, Exhibit 21, same
21          thing:  Investors, potential investors in Schmidt's
22          Naturals?
23          A.       So in Exhibit 21, it looks like this is --
24          these are e-mails between me and Michael, not with
25          any potential investor that he may have been
```

                                            Page 220

1        speaking to at the time.

2              Did you get that?

3                    THE REPORTER:  You're muted.

4     BY MR. JOYNER:

5     Q.      I'm sorry.  Mr. Villar, in the e-mail

6     chain that is Exhibit 21, you mentioned it's an

7     e-mail between you and Michael Cammarata, but it

8     references various potential investors you were

9     keeping track of as potential investors in

10    Schmidt's Naturals, correct?

11    A.      Yes.

12              MR. JOYNER:  Let's introduce

13    Exhibit -- I know we're jumping around, but we have

14    not introduced exhibits 12 and 13.  We'll start

15    with Exhibit 12.

16              (EXHIBIT NO. 12, e-mail from

17    Christopher Villar dated 7/28/2017, was marked

18    for identification and attached hereto.)

19    BY MR. JOYNER:

20    Q.      Do you recognize this document?

21    A.      These -- if you don't mind, just give me a

22    second to read through all these.

23    Q.      Mr. Villar, your -- your e-mail to Michael

24    Cammarata is at the very top on the first page,

25    correct?

                                          Page 221

```
 1          potential shops and boutiques for sale, correct?
 2          A.       I don't know that -- the way you are
 3          phrasing that question -- to me, it just looks like
 4          this person who is on Michael's e-mail list says
 5          that she's going to try out samples and pass them
 6          along to -- and talk about them with their
 7          friends -- with her friends and -- it says who own
 8          boutiques and retail shops.  So I guess this person
 9          was excited about trying to help out Mike.
10          Q.       If you go back to Exhibit 13, before we
11          move away from these exhibits, are the instructions
12          in Exhibit 13 the type of instructions you would
13          typically receive from Michael Cammarata?
14          A.       Which -- which instruction are you
15          speaking to?
16          Q.       He sent an e-mail, Michael Cammarata,
17          to Jeff --
18          A.       Okay.  Are you talking about -- sorry.
19          Q.       -- at fuelindustries.com, correct, on
20          December 25th?  And he copied you --
21          A.       Yes.
22          Q.       -- correct?
23                   And in that e-mail from Michael Cammarata
24          to Jeff, he copies you, and he says, "Just send my
25          assistant, Chris Villar, your current address, and
```

Page 226

1      we'll ship one out right away" -- or, "we'll ship

2      one out."

3              And he gives your e-mail address.  Do you

4      see that?

5      A.      I don't see where I am cc'ed on the e-mail

6      that he sent to Jeff.

7      Q.      I'm sorry?

8      A.      At Fuel Industries.  No.  I believe that

9      he -- that Jeff was able to get my e-mail address

10     from the message that was sent to him from Michael,

11     and then he responded -- reached out to me to

12     get -- have the samples sent to him.

13     Q.      Correct.  And then you took care of it,

14     correct?  Without any --

15     A.      Yes.

16     Q.      -- further instructions from

17     Mr. Cammarata?

18     A.      Well, before this all -- this all

19     happened, he instructed me who to contact at -- at

20     the factory to facilitate these requests from these

21     people.

22     Q.      I mean, if you look at Exhibit 14, on

23     December 25th, Michael Cammarata sends you an

24     e-mail that says, "You will need to build an Excel

25     as these come in."  Do you see that?

Page  227

1    A.        Yes.

2    Q.        And is that the typical type of

3    instruction you would receive from Michael

4    Cammarata?

5    A.        I received all kinds of instruction from

6    Michael Cammarata.  But --

7    Q.        Would they usually -- go ahead.

8    A.        Go ahead.  No, no, go ahead.

9    Q.        Would they usually be short instructions,

10   and you would know what to do, just like here,

11   where he says "You will need to build an Excel as

12   these come in"?

13   A.        Often I'd have to call him and ask him,

14   you know, "What did you mean by that?"  And then he

15   would further explain to me on the phone. But --

16   Q.        So as you sit here today, would you

17   have --

18   A.        As I sit -- sorry, go ahead.

19   Q.        Would you have understood what he meant

20   when he says, "You will need to build an Excel as

21   these come in"?

22   A.        In regards to this, just looking at it,

23   because I don't recall what I was thinking at the

24   time, or what I actually did, but it seems to me

25   like he just wanted me to build an Excel sheet

Page 228

```
 1        with -- to keep track of all these contacts that
 2        were requesting, so we could go back and make sure
 3        that they received their samples.  That's what I
 4        would assume.  But again, I don't -- you're asking
 5        me to give you ...
 6    Q.        Did your company, Virtual Mountain
 7        Capital, provide any input to KM Organic regarding
 8        potential investments other than Schmidt?
 9    A.        No.
10    Q.        So if VMC, as you've testified today,
11        Virtual Mountain Capital, would have benefited from
12        any of these investments going through, why didn't
13        you produce any documents related to Virtual
14        Mountain Capital?
15    A.        Virtual Mountain Capital is not responsive
16        to my employment.
17    Q.        So it's very similar to my question about
18        why did you not produce documents regarding the
19        Indigo Project.  If these are projects you worked
20        on and would have benefited from due to your work
21        for Cammarata, why did you not produce documents
22        related to the Indigo Project and Virtual Mountain
23        Capital?
24    A.        Okay.  Well, I already answered your
25        question in regards to Virtual Mountain Capital.
```

Page 229

```
1       Q.        So we disagree.  We believe the request

2       would have picked up those e-mails between you and

3       Kyle Smithson.

4            On what basis did you come to the

5       determination that those e-mails between you and

6       Kyle Smithson were not responsive to our document

7       request?

8       A.        Because they had to do with --

9                 MR. FRISCH:  I'm going to object.

10      I'll just remind the witness that he shouldn't

11      reveal anything that was discussed between you and

12      your attorneys as attorney-client privileged.

13      A.        Yeah.  So anything that -- I don't know

14      how to answer that question.

15      Q.        So, Mr. Villar, do you know anything about

16      a Department of Labor investigation?

17      A.        That's a pretty broad statement.  Can you

18      please be specific?

19      Q.        Are you aware of any legal opinion given

20      to any of the defendants that you were not being

21      paid as required under the law?

22                MR. FRISCH:  Objection.  Vague.

23      A.        I -- I -- I don't understand what you're

24      asking me.  Is there a document that I can look at?

25      Q.        There's no document.  I'm asking if you're
```

                                                    Page 242

1     aware of any document or any opinion that says that

2     you were not being paid as required under the law

3     because of your independent contractor status.

4     A.       Am I aware of any document or opinion that

5     I wasn't being paid properly under the law?  Is

6     that what the question is?  Or can you please

7     clarify?

8     Q.       Yes.

9     A.       Not specifically.

10    Q.       Are you aware of any Department of Labor

11    investigation into KM Organic or Cammarata

12    Management regarding independent contractor status?

13    A.       I am not aware.

14              MR. JOYNER:  Let's go ahead and

15    introduce Exhibit 27 and Exhibit 28.

16              (EXHIBIT NO. 27, Christopher

17    Villar's responses and objections to EG

18    Systems, LLC's first request for production,

19    was marked for identification and attached

20    hereto.)

21              (EXHIBIT NO. 28, document with

22    cover sheet Exhibit A, containing text

23    messages, was marked for identification and

24    attached hereto.)

25              MR. FRISCH:  Jeff, we're now

Page 243

```
 1    STATE OF TENNESSEE:

 2                    I, PATRICIA A. NILSEN, Licensed
          Reporter for the State of Tennessee, CERTIFY:

 3                    1. The foregoing deposition was
          taken before me at the time and place stated in the

 4        foregoing styled cause with the appearances as
          noted;

 5                    2. Being a Court Reporter, I then
          reported the deposition stenographically to the

 6        best of my skill and ability, and the foregoing
          pages contain a full, true and correct transcript

 7        of my said stenographic notes then and there taken;

                      3. I am not in the employ of and am

 8        not related to any of the parties or their counsel,
          and I have no interest in the matter involved.

 9

                      WITNESS MY SIGNATURE, this,

10        the April 2, 2020

11

12

13

14

15

16

17

18        PATRICIA A. NILSEN, RMR, CRR, CRC

19        TN Licensed Court Reporter

20        LCR Number: 717

21        Expiration: 6/30/2020

22

23

24

25
```

Page 258